**WYOMING FARM BUREAU MUTUAL INSURANCE COMPANY, a Corporation, Plaintiff,**

v.

**Curtis L. SMITH and Jamie L. Smith, Defendants.**

**Civ. No. 1120.**

United States District Court
D. Montana,
Missoula Division.

Oct. 25, 1966.

Corette, Smith, Dean & Robischon, Butte, Mont., for plaintiff.

Knight & Dahood, Anaconda, Mont., for defendants.

## OPINION

RUSSELL E. SMITH, District Judge.

This action for a declaratory judgment is brought by the plaintiff (called the Company) to determine its liability to the defendants for losses which the defendants suffered as the result of a hostile fire. Defendants (called the Smiths) counterclaimed, claiming that the Company had insured them against loss by fire and praying for damages in the amount of $20,000.00. The case was tried to a jury. At the close of the evidence it appeared to the court that there were but two fact questions. Those questions were submitted to the jury and were answered. This Opinion constitutes the court's findings of fact and conclusions of law.

The facts are: The Company is an insurance company which writes fire insurance for individuals who are members of the Montana Farm Bureau and the Wyoming Farm Bureau. Prior to 1964, using its Standard Agent's Agreement, the Company appointed Robert L. Everhard as its agent in Granite County, Montana. The Standard Agent's Agreement described Everhard as a general agent for the purpose of soliciting applications for insurance and collecting and remitting initial premiums in the territory designated. Section 4 of the Agreement provided:

> "The Agent shall not make * * * any contract of insurance * * *. The agent shall not incur any indebtedness or liability on behalf of the Company in any manner whatsoever."

Some time prior to January 24, 1964, Curtis L. Smith sought out Everhard and told him that he, Smith, was interested in insurance for his poultry house. As a result Everhard went to see Smith at his home on the evening of January 24th. In the course of the evening Smith purchased a membership in the Granite County Farm Bureau for $20.00, signed an application for insurance and paid a first annual premium in the amount of $66.00. The application, together with the premium, was mailed to the Company at its Home Office in Laramie, Wyoming. The Home Office promptly rejected the application and returned it, together with the premium to Everhard, who received it in Philipsburg, Montana, on February 3rd. Everhard made efforts to reach the Smiths on that day but was unsuccessful. On the 4th of February the poultry house and contents which were described in the application, burned. On the day of the fire Mrs. Smith advised Everhard of the loss. He in turn advised her of the Company's position and gave to her the Company's letter of rejection, the rejected application, and the $66.00. Later the $66.00 was tendered back to the Company which refused to accept it.

The solution of this case depends upon the legal effect of what happened between Everhard and Curtis Smith on the night of January 24th. The Company had furnished Everhard with application forms and one of those forms was used. It was, except for a signature of Smith, completed in the handwriting of Everhard. The application contains the names of the parties, a description of the property, the fire insurance rate, the amount of insurance on the items of real and personal property, and the total premium. It likewise contained in the upper right hand corner of the front page a printed box as follows:

| Policy Term | 365 | (Days) | (Years) |
|---|---|---|---|
| From Jan 25 | | 1964 | Year |
| To Jan 25 | . | 1965 | Year |

The underscored writing was in ink in Everhard's handwriting.

On the reverse side of the application the following language appears:

> "It is understood and agreed that the insurance herein applied for shall not be effective unless and until approved by the Company at its office in Laramie, Wyoming."

Notwithstanding the above language the Company had given Everhard actual authority to fill in the "Policy Term" provisions of the application exactly as he

did fill them in. It appears without dispute from the testimony of the Company's witnesses that it was the practice of the Company to accept applications in this form and then when an application was approved to retroactively date the policy according to the commencing date of the term shown in the application. Any policy written in this case would have shown the term exactly as it appeared in the application, i. e., January 25, 1964, and the Company would not have returned the portion of the premium covering the period of time between the date shown on the application and the date that the Company approved it. In short, the Company would have kept the premium for that period during which it now asserts there was no insurance coverage.[1]

There was a dispute as to what happened at the time the application was written. The Smiths testified that they asked the agent when the coverage would be effective and that the agent told them as of January 25, 1964. The agent testified that he said it would be in a few days when the application was approved. These conflicts were resolved by the jury's answers to special interrogatories as follows:

1. At the meeting between the parties on January 24, 1964, was the subject of the effective date of the insurance policy discussed?

Yes __x__        No. _____ (Check the correct Answer)

2. If your answer to Question No. 1 is "yes", then answer this Question No. 2:

Did the words spoken by Mr. Everhard indicate to the Smiths that their property would be insured: (a) When the application was approved by the Home Office in Laramie, Wyoming, _____, or (b) On January 25, 1964 __x__.

—————◆—————

The Company now urges that it had a right to select the risks it would underwrite, which is undoubtedly true; that its agent had no authority to issue insurance without Home Office approval, which is what the Standard Agent's Agreement provides; that the clause in the application requiring Home Office approval was notice to the Smiths of the limitation on the agent's authority; that if Everhard made any statements relative to present insurance he had no authority to make them. There was not in this agreement, as there is in some, a clause to the effect that the agent had no power to alter any of the terms of the application. The Standard Agent's Agreement, whatever its effect as between the Company and the Agent, is not conclusive as to third parties.[2] Everhard did have authority to take the application, and he did have authority to show the policy term on the application exactly as he did show it. Where an agent is authorized to use a form in the solicitation of business and is authorized to complete the form in a particular way, he has as a matter of law an implied authority to explain to the prospective customer the meaning of the writing. If in using words which are within the actual authority of the agent to use, the agent creates a contract, a principal is in no position to urge that general and undisclosed limitations of the agent's power prevent that contract from aris-

1. A few days after the 24th of January Smith applied to the Company for an automobile liability policy. The policy when delivered bore the date shown on the application, not the date of approval.

2. Greening v. Gazette Publishing Co., 108 Mont. 158, 88 P.2d 862 (1939).

ing. It is not necessary to the formation of a contract here that a party have an intent to be bound.[3]

■ If the acts of Everhard are treated as the acts of the Company, did the writing which the parties produced create a contract? The writing is ambiguous. The term "application" in itself suggests something less than an immediately effective insurance contract. The words of the home office approval clause, and the use in the application of the words "property be insured" and "amount of insurance desired" have the same import. However, the contents of the policy term box clearly indicate that an insurance term was to commence on the 25th of January and the repeated use of the words "property insured", lends support to that meaning. The writing is ambiguous, but if the written material controls the printed[4] and if the words used by Everhard are to be interpreted in the sense that the Smiths understood them[5] as Montana law requires, then a contract of insurance did result and the plaintiff is liable.[6]

The court is not unmindful of the fact that neither party intended the application form to be the final repository of the insurance agreement and that it was within their contemplation that additional clauses relating to such formal matters as proofs of loss, and perhaps to matters of substance such as the permitted use of the property would be included in the final contract. If the parties here had been unable to agree on these matters, or if the Company's non-acceptance had been communicated prior to the loss a different problem would be presented because it is an estoppel which constitutes the Company's acceptance of what amounts to the temporary insurance found here, and once the Smiths were no longer in a position to rely on the insurance term stated in the application, then the estoppel would fall and the Company's acceptance would fall with it.

■ The parties stipulated that the court might fix the values, and that the amount of $2,000.00, the proceeds of other insurance, might be deducted. It was conceded that the Montana Valued Policy Law governed the value of the real property. The uncontradicted evidence disclosed that the personal property had a value of at least $10,000.00. The Company is entitled to the premium now in Smith's hands in the amount of $66.00. Defendants are therefore entitled to judgment on their counterclaim in the amount of $17,934.00.

3. "In the final analysis, the whole objective theory of contracts, as distinguished from the subjective theory, is based on analogy to estoppel. This is apparent whenever a person is held bound by a contract because of his manifestations when his manifestations are contrary to his actual state of mind." Williston on Contracts, Vol. 1 § 98 (rev. ed. 1936) p. 314.

4. Where a contract is partly written and partly printed, or where part of it is written or printed under the special directions of the parties, and with a special view to their intention, and the remainder is copied from a form orginally prepared without special reference to the particular parties and the particular contract in question, the written parts control the printed parts, and the parts which are purely original control those which are copied from a form. And if the two are absolutely repugnant, the latter must be so far disregarded. Section 13–717, R.C.M.1947.

5. If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it. Section 13–715, R.C.M.1947.

6. This is the result reached in Mayfield v. Montana Life Insurance Company, 62 Mont. 535, 205 P. 669 (1922) where a general agent was held to have authority to waive the home office approval clause. Whether Everhard was a general agent or not, the authority given as to the term of insurance matter was sufficient to empower him to waive the clause at least to the extent indicated in the opinion.