No. 12702

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

EVAN M. MILLER,

                    Plaintiff and Appellant,

    -vs-

PETE WALTER and BANK OF COLUMBIA FALLS,
a banking corporation,

                    Defendants and Respondents.

---

Appeal from: District Court of the Eleventh Judicial District,
             Honorable Robert C. Sykes, Judge presiding.

Counsel of Record:

    For Appellant:

        Graybill, Graybill, Ostrem and Warner, Great Falls,
          Montana
        Leo Graybill, Jr. argued, Great Falls, Montana

    For Respondents:

        White, Vadala, Springer and Astle, Kalispell,
          Montana
        David L. Astle argued, Kalispell, Montana
        Patrick M. Springer appeared, Kalispell, Montana

---

                          Submitted:  September 12, 1974

                           Decided:  OCT 21 1974

Filed: OCT 21 1974

_Thomas J. Kearney_
                          Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal from a judgment of the district court of the eleventh judicial district, in the County of Flathead, rendered for the defendant Bank of Columbia Falls as against the plaintiff Evan M. Miller. A default judgment rendered for plaintiff, Evan M. Miller, against the defendant, Pete Walter, has not been appealed.

In July 1972, Al Sihrer owned a 1965 Mack logging truck which was mortgaged to the defendant Bank of Columbia Falls (hereinafter referred to as the Bank) for the sum of $5,000. On July 18, 1972, Sihrer sold the truck to defendant Walter. Also on July 18, 1972, Walter gave a security interest in the truck to the Bank for a loan of $6,000. $5,000 of this loan went directly to pay off the Bank's loan to Sihrer. The other $1,000 was deposited into Walter's checking account with the Bank. This $1,000 arose out of the discussion Walter had with the Bank to the effect that the truck needed a new engine and was for that purpose. On that date, the Bank wrote the following letter:

"b a n k   o f   C O L U M B I A   F A L L S
"P. O. BOX 280 / TELEPHONE (406) 892-3281 / COLUMBIA FALLS, MONTANA 59912

"HOWARD AUSTIN, Executive Vice President                "July 18, 1972

"Mr. Pete Walter
"Route 4
"Kalispell, Montana 59901

"Dear Pete:

"This is to advise you that the Bank of Columbia Falls has committed for a loan of $1,000 for the purchase of the Cummings engine to be used as a replacement engine in your truck. It is understood that this will be put with the $1,000 that you have coming from your accounts receivable for a total of $2,000 to be used in the purchase of this item.

"It is our recommendation that a portion of these funds be held back for a certain number of days to give yourself a chance to install the motor for a trial period. On this basis, we are

- 2 -

willing to guarantee these funds to whomever you purchase this engine from subject to the above conditions.

"Very truly yours,

"/s/ Howard Austin
"Howard Austin
"Exec. Vice President

"HA/sk"

The district court made the following conclusion of law:

"5. That it was not the intention of the defendant Bank of Columbia Falls that exhibit "A" be a letter of credit or guarantee but a means by which the purchase of said engine could be accomplished."

Although Walter had previously located an engine in Miller's shop in Havre, Austin testified that he did not recall whether there had been any discussion between himself and Walter as to a particular engine to be purchased with the loan. On July 20, 1972, Walter went to Havre and purchased the engine for $2,000 and a starter for $100. Miller testified that, on the strength of the letter, which he read, he let Walter take the engine and the starter, Walter paying only $1,000 by his personal check at that time. Miller testified that he would not have let Walter take the engine and starter without paying the full price if it had not been for the letter. Miller then attached the letter to the sales slip which he retained.

Walter later installed the engine in the truck. On September 21, 1972, shortly after installation, the Bank repossessed the truck for nonpayment by Walter of his obligation to the Bank. Sometime prior to September 27, 1972, but after the Bank repossessed the truck, Miller contacted Walter about payment of the balance due on the engine and learned of the Bank's repossession. Miller then contacted the Bank about the matter. On December 29, 1972, the Bank sold the truck to satisfy its security interest.

Miller brought this action in the district court to recover damages for nonpayment of the $1,000 due on the engine and the $100 due on the starter. A default judgment was entered against Walter

for the sum of $1,100. Walter is bankrupt. The case was heard by the court without a jury and judgment was rendered for the Bank. Miller filed a motion to amend judgment to substitute plaintiff's proposed findings of fact and conclusions of law. The court by order dated December 27, 1973, denied Miller's motion. From the Judgment and order Miller appeals.

The issues raised herein are as follows:

1. Whether the Bank's letter constitutes a guaranty of the purchase price of the engine purchased by Walter from Miller.

2. If the letter is a guaranty, whether it is binding against the Bank in light of the fact that Miller did not communicate notice of acceptance of the alleged guaranty to Bank.

3. Whether Bank is responsible for payment of the purchase price of the engine merely because it held a security interest in the truck.

From a reading of the letter that is the subject of this dispute and the facts above enumerated, this Court holds as a matter of law that the letter is a guaranty. Section 30-101, R.C.M. 1947, defines "guaranty" to be " * * * a promise to answer for the debt, default, or miscarriage of another person." The Bank specifically uses the word "guarantee". In addition, the last sentence of the letter is rendered absolutely meaningless if not construed as a collateral promise to another: The Bank had already stated in the first paragraph that they were committed to the loan to Walter. The promise was to answer for the debt of "another", Walter, in that it was a guarantee "to whomever you purchase this engine from * * *."

The Bank's contention that there could be no guaranty because the Bank did not intend the letter to be a guaranty and thus there was no meeting of the minds is without merit. The mutual assent essential to the formation of a contract, in this

- 4 -

case a contract of guaranty, must be gathered from the outward objective manifestations of the parties and not by the subjective undisclosed intent of one of the parties. Montana-Dakota Power Co. v. Johnson, 95 Mont. 16, 22, 23 P.2d 956. Wyoming Farm Bureau Mutual Ins. Co. v. Smith, 259 F.Supp. 870, 873 (D. Mont.), aff'd 377 F.2d 918 (9th Cir.); Williston on Contracts, Vol. 1, section 98 (rev. ed. 1936) p. 314.

The Bank next contends that even though the letter is a guaranty, notice of acceptance of the guaranty was not given to the Bank as required by section 30-106, R.C.M. 1947. It reads:

> "A mere offer to guaranty is not binding until notice of its acceptance is communicated by the guarantee to the guarantor; but an absolute guaranty is binding upon the guarantor without notice of acceptance."

Assuming for the purpose of this argument that the letter was not an absolute guaranty but was merely an offer to guaranty, we hold that the notice of Miller's acceptance was communicated to the Bank at the very latest, shortly after the Bank's repossession of the truck and that such notice satisfies the requirements of the statute.

In support of our holding, we cite from 1 Corbin on Contracts, Section 68:

> "Any attempt to review and criticize the innumerable cases in the field of suretyship and guaranty must be left to monographic treatises on that special topic. The confusion and conflict in that field seem to be due in large part to a similar confusion in the general doctrines applicable to all agreements.

> "It is beyond question that in many thousands of cases an offer to become guarantor for another has been made in such terms as to induce the offeree to advance money, goods, or services on credit without first sending any notice of acceptance to the offeror. Later, when demand is made for him to pay the debt of another in accordance with his promise, the guarantor complains of this lack of notice and asserts that his offer was not accepted as the law requires.

- 5 -

"With respect to this, there is nothing peculiar to the relation of suretyship that requires the application of rules different from those applicable in other contracts. One who offers to be surety or guarantor for another can prescribe or suggest the mode of acceptance, just as in other cases. He can prescribe the giving of notice, by mail or otherwise, if he likes. In very numerous cases, however, he makes no such suggestion; and if the offeree acts as requested, the offer should be held to be accepted.

"In a well known case [Bishop v. Eaton, 161 Mass. 496, 37 N.E. 665], Frank Eaton wrote from Nova Scotia to Bishop in Illinois: 'If Harry needs more money, let him have it, or assist him to get it, and I will see that it is paid.' In reliance on this and at Harry's request, Bishop indorsed Harry's note to Stark. This action by Bishop was an operative acceptance that instantly bound Frank Eaton as surety. A telegraphic revocation would have been too late, even though Bishop had not yet written or mailed any notice to Frank that he had complied with the latter's request. A unilateral contract had been consummated by an offered promise requesting action, followed by the offeree's action as requested. Frank Eaton's legal duty as surety for Harry may, indeed, be conditional on various events, including a notice or two, to occur subsequently; but it is not the occurrence of these events that constitutes acceptance of the offer.

"The foregoing reasoning has received much judicial approval; and it is adopted by the American Law Institute. Many of the cases that say that a notice of acceptance is required confuse notice as the required form of acceptance of an offer with a later notice as a condition precedent to the surety's duty to make payment of the debt.

"An offer to become surety for another may request some promise in return, either by the creditor or by the principal obligor. If it does this, a notice that the requested promise is given must be made in order to accept the offer. Mere action in reliance on the surety's offer would not be enough. * * *"

The Restatement of Security, § 86, in which the terms

"guarantor" and "surety" are used synonymously, is in accord:

"Where the surety offers to guarantee an extension of credit to the principal and the credit is extended as the sole consideration for the surety's promise, the contract is complete upon the extension of credit, but if the surety does not know of the extension of credit and has no adequate means of ascertaining with reasonable promptness and certainty that the credit has been extended and

the creditor should know this, the contract of the surety is discharged unless within a reasonable time after the extension of credit the creditor exercises reasonable diligence to notify the surety thereof."

From the foregoing analysis, it can be readily seen that section 30-106, R.C.M. 1947, is in accord. The statute does not require "acceptance" to be communicated to the guarantor, but merely "notice of its acceptance". Thus the contract of guaranty was complete when Miller accepted the offer of guaranty by the act of selling the engine and extending credit to Walter. Thereupon there arose the statutory requirement of notice of acceptance as a condition precedent to the guarantor's duty to make payment.

Section 30-106, R.C.M. 1947, does not, however, specify within what period of time notice of acceptance must be given by the guarantee to the guarantor. In the absence of such specification, to quote from the Restatement: " * * * the contract of the surety is discharged unless within a reasonable time after the extension of credit the creditor exercises reasonable diligence to notify the surety thereof." Miller sold the engine to Walter on July 20, 1972. The Bank repossessed the truck on September 21, 1972. Miller contacted the Bank regarding the matter sometime between September 21 and September 27, 1972. The Bank did not sell the truck until December 29, 1972. There is no contention whatsoever that the Bank did not learn of Miller's acceptance of their offer of guaranty within a reasonable time after his acceptance. Especially is this so in a case such as this where the guarantor is deeply involved financially in the object to which the purchased item is to be attached. There is not, and indeed there cannot be, any contention that the Bank was in any way injured by Miller's delay in giving notice of acceptance. On a loan of $1,000 for the purchase of the engine, the Bank gained the benefit of a $2,000 engine which it later realized when the

truck was repossessed and sold by the Bank. Not only was there no injury, the Bank reaped a windfall.

The Bank next contends that it only guaranteed $1,000 and that its obligation was fulfilled by the deposit of $1,000 in Walter's checking account. A resolution of this issue turns on the meaning of "those funds" as used in the letter. Miller testified:

> "A.  Well, I figured it meant that they had guaranteed the rest of the purchase price."

Although he later hedged his answer, to such a point that this Court is unable to tell what he meant, Mr. Austin's first reaction to the question "What does 'these funds' mean" was:

> "A.  It goes back to the funds I am talking about in the first paragraph. These are the funds that we are talking about in the total picture."

It is clear that the phrase "these funds" is ambiguous as to whether it refers to the $1,000 loan, the $1,000 accounts receivable or the $2,000 "total picture". Any uncertainty in a contract should be interpreted most strongly against the party who caused the uncertainty to exist. Section 13-720, R.C.M. 1947. Thus, we hold that, by guaranteeing "these funds", the Bank guaranteed the total sum of $2,000. This interpretation is bolstered by the fact that the Bank did not hand Walters a cashier's check or in any other way earmark the $1,000; but, rather, placed it in Walter's checking account to use as he saw fit.

From the view we take of the first two issues raised, it becomes unnecessary to discuss the third issue raised.

The judgment is reversed and remanded to the district court with instructions to enter judgment for plaintiff Evan M. Miller against defendant Bank of Columbia Falls in the amount of $1,000.

The judgment is reversed.

_____
                        Justice

- 8 -

We concur:

_____
   Chief Justice

_____
   John Conway Harrison

_____
Justices

- 9 -