**L.R. BRETZ, Plaintiff–Appellant,**

v.

**PORTLAND GENERAL ELECTRIC CO., Defendant–Appellee.**

No. 87–4206.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 1, 1989.

Decided Aug. 14, 1989.

L.R. Bretz, Billings, Mont., pro se.

Roger K. Harris, Portland, Or., for defendant-appellee.

Before TANG, BOOCHEVER and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

We consider again the validity of Sam Goldwyn's aphorism that an oral contract isn't worth the paper it's written on. L.R. Bretz, a Montana resident, brought a diversity suit against Portland General Electric (PGE), an Oregon corporation, for breach of a contract for the sale of PGE's stock in its wholly-owned subsidiary, the Beartooth Coal Company. The district court granted PGE's motion for summary judgment, holding that the exchange of letters between Bretz and PGE did not satisfy Montana's statute of frauds.[1] We review the district court's grant of summary judgment de novo. *See Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986).

## Facts

In the late summer of 1983, Bretz, identifying himself as special agent in Montana for Western States Energy Ventures, wrote PGE and Beartooth offering to buy the Beartooth stock for $2 million. Bretz

1. The parties agree that this case is governed by Montana law.

sought a variety of representations from PGE concerning the Beartooth securities, their sole ownership by PGE, the nature and assignability of Beartooth's holdings, and so forth. The letter also detailed an elaborate procedure for PGE's acceptance of the offer and for the completion of the transaction.[2] PGE responded on August 5, 1983, by sending Bretz a revised version of his offering letter, along with a request that Bretz "resubmit[ ] the letter as an offer so that it can be considered by Portland General Electric Company's officers." Excerpt of Record (ER) 54. PGE's August 5 letter also included a disclaimer: "Although we have reworked the terms and conditions [of your offer], we have not discussed the same nor the amount of your offer with Company management. They may request other or different terms or additional compensation." *Id.*

On August 10, 1983, Bretz replied, noting that "[y]ou have redrafted my offer and it appears that we are coming to a meeting of the minds." ER 58. Bretz incorporated PGE's suggestions and added some "slight" revisions of his own. As in the first offer, Bretz's August 10 communication spelled out a detailed and precise means for PGE to indicate its acceptance. In its August 23, 1983, response to Bretz's August 10 letter, PGE stated:

Dear Mr. Bretz:

Thank you for your offer of August 10, 1983 to purchase the stock of Beartooth Coal Company. Two issues have caused problems.

Your offer of $2,000,000 cash is not commensurate with the outstanding commitment we have for purchase of the stock. Financing arrangements have caused two delays in closing this commit-

ment. *Consequently we would be receptive to an offer of $2,750,000 from you and your associates provided the matter could be closed in a timely manner as proposed in your letter of August 10, 1983.*

The warranty of quantity and quality referenced in your letter would have to be based on the best information available to PGE. . . .

*I would appreciate you resubmitting your offer on the above basis.*

ER 62 (emphasis added).

On August 29, 1983, Bretz wrote PGE an amended version of his reworked offer. The amendment, captioned "Acceptance of Offer," and signed by Bretz, stated that the "Foregoing Offer is amended to state a purchase price of $2,750,000.00. *The joint venture accepts your counter-offer which includes our terms as set forth in letter, as above. We consider that a contract for sale exists."* ER 66 (emphasis added). The following day, Bretz, allegedly under the impression that he had a contract to purchase PGE's interest in Beartooth, executed an agreement with a third party for the sale of coal from the Beartooth property. On September 7, 1983, Tom Owens of Beartooth telegraphed Bretz that "It is urgent that you contact me immediately re your offer for Beartooth Coal Co." ER 171. Bretz alleges that on or about that day PGE breached its contract for the sale of Beartooth.

Bretz then filed this lawsuit, claiming breach of contract and seeking over $25 million in damages. PGE filed a motion for summary judgment, arguing that the exchange of letters did not create an enforce-

---

**2.** Bretz's August 1, 1983, letter stated:

It is to be understood that the exact procedure from point of your receipt of this offer will be as follows:

    I. You will advise by telegraphic communication as follows:

"YOUR OFFER AS PER LETTER OF AUGUST 1, 1983 IS ACCEPTED"

    II. I will immediately thereafter send you a draft to hold in the amount of $500,000.00 pending:

a) Receipt of all documentation needed to verify your offering data;

b) Receipt of all of your proposed transferring papers; and

c) Receipt of copy of current Mining Permit and confirmation of transferability.

    III. Upon completion of Steps II(a)(b)(c) I will come to Portland, Oregon, pickup all closing papers, as required, and, if all are in order, I will execute same on behalf of jv and pay over to you, or your order, the balance of $1,500,000.00.

Time and confidentiality are of the essence at all times in this transaction.

Excerpts of Record (ER) 53.

able contract because they did not comply with Montana's statute of frauds. Magistrate Dale agreed, holding that the letters reflected only unconcluded negotiations, not a consummated contract. He further held that parol evidence could not be used to bring the writings into compliance with the statute. The magistrate also rejected Bretz's equitable estoppel argument, finding "no evidence that defendant's conduct caused Bretz to change his position to his detriment." Magistrate's Findings and Recommendation at 8, *Bretz v. Portland Gen. Elec. Co.*, No. 86–623–DA (D.Or. July 30, 1987). ER 16. The district court adopted the magistrate's findings and recommendations and granted PGE's motion for summary judgment.

### Discussion

A. Bretz first contends that PGE's August 23 letter, when considered in conjunction with prior conversations and correspondence, was a counteroffer by PGE which, when accepted by Bretz, matured into a contract. At the very least, he argues, the documents paint an ambiguous picture which he should be allowed to fill in with parol evidence.

The parties agree that PGE's sale of Beartooth stock is covered by Montana's statute of frauds. Mont.Code Ann. § 30–8–319 (1987). Although the writing required by the statute of frauds need not be contained in a single document, *see, e.g., Anderson v. KFBB Broadcasting Corp.*, 143 Mont. 423, 391 P.2d 2, 5 (1964); *Johnson v. Elliott*, 123 Mont. 597, 218 P.2d 703, 707 (1950), the writings together must contain all the essential elements of a contract, including evidence of the parties' assent to be bound to the terms of the agreement. Mont.Code Ann. § 28–2–102 (1987); *Weigand v. Montana Land & Real Estate Invs., Inc.*, 724 P.2d 194, 196 (Mont.1986).[3] While parol evidence may not be used to supply an essential contract term, *see Dineen v. Sullivan*, 123 Mont. 195, 213 P.2d 241, 243 (1949), such evidence is admissible to explain ambiguities. *See, e.g., McNabb v. Norine*, 204 Mont. 330, 664 P.2d 927, 929–30 (1983); *Johnson v. Ogle*, 120 Mont. 176, 181 P.2d 789, 791 (1947).

In Montana, as in most other jurisdictions, "[t]he mutual assent essential to the formation of a contract ... must be gathered from the outward objective manifestations of the parties and not by the subjective undisclosed intent of one of the parties." *Miller v. Walter*, 165 Mont. 221, 527 P.2d 240, 243 (1974); *Wyoming Farm Bureau Mut. Ins. Co. v. Smith*, 259 F.Supp. 870, 873 & n. 3 (D.Mont.1966), *aff'd*, 377 F.2d 918 (9th Cir.1967).[4] Whether a party has made a firm offer therefore turns on the facts and circumstances of each situation, as well as on what the other party might reasonably have inferred from the statements and behavior of the first. The classic statement of this objective theory of assent was offered by Williston:

> The modern law rightly construes both acts and words as having the meaning which a reasonable person present would put upon them in view of the surround-

---

**3.** Montana Code Annotated section 28–2–102 states:

It is essential to the existence of a contract that there be:
(1) identifiable parties capable of contracting;
(2) their consent;
(3) a lawful object; and
(4) a sufficient cause or consideration.

**4.** This was not always the case. As Professor Farnsworth has observed, whether a court's determination of a party's assent to an agreement should turn on the party's actual or apparent intent "provoked one of the most significant doctrinal struggles in the development of contract law, that between the subjective and objective theories." E.A. Farnsworth, *Contracts* § 3.6 at 113 (1982). The dispute was resolved in favor of the objective theory of assent, *id.* at 114, which, as Professor Randy Barnett has pointed out, promotes greater "reliability of contractual commitments":

> Permitting a subjective inquiry into the promisor's intent could ... enable a promisor to fraudulently undermine otherwise perfectly clear agreements by generating and preserving extrinsic evidence of ambiguous or conflicting intentions. Such a strategy might create a de facto option in the promisor. The promisor could insist on enforcement if the contract continued to be in her interest, but if it were no longer advantageous, she could avoid the contract, by producing evidence of a differing subjective intent.

Barnett, *A Consent Theory of Contract*, 86 Colum.L.Rev. 269, 273 (1986).

ing circumstances. Even where words are used, "a contract includes not only what the parties said, but also what is necessarily to be implied from what they said." And it may be said broadly that any conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as such. 1 S. Williston, *A Treatise on the Law of Contracts* § 22A, at 49–50 (3d ed. 1957) (footnotes omitted). In making this inquiry, courts must ask whether the document at issue, in light of prior negotiations and the expectations of both parties, reasonably led its recipient to believe it was within his power to close the deal by acceptance.

■ The key question here is whether PGE's August 23 letter could reasonably be construed as an offer, or whether it was merely an invitation to Bretz to renew his offer to PGE. An examination of the letter and the surrounding circumstances lead to only one reasonable conclusion: PGE's August 23 letter was merely an invitation to continue negotiations. The letter plainly states that PGE remained "receptive to an offer" from Bretz, and suggests terms that might make the offer more acceptable to PGE.[5] The letter also refers to another commitment PGE had for the sale of the stock, implying that PGE would have to free itself from that commitment before undertaking another. PGE's letter also specifies the manner in which the deal would be closed: "as proposed in [Bretz's] letter of August 10, 1983," which, in turn, provided an elaborate mechanism for closing the deal. *See* note 2 *supra*. Finally, PGE's letter concludes, not with an offer to close the deal, but with an invitation that Bretz "resubmit [his] offer on the above basis."

The August 23 letter quite clearly evidences PGE's intent *not* to make an offer. Under Montana law, "when the instrument itself negates the existence of a contract," it may not be relied on for purposes of satisfying the statute of frauds. *Anderson*, 391 P.2d at 5.[6] Neither PGE's August 23 letter alone, nor the letter considered in concert with the remaining documents and communications, establishes the existence of a written contract that would satisfy Montana's statute of frauds. The district court therefore did not err in concluding that the parties had failed to enter into an enforceable contract for the sale of the Beartooth stock and granting summary judgment on that issue.

■ B. Bretz also argues that PGE should be equitably estopped from raising the statute of frauds as a defense. He claims that PGE misled him into thinking that they had a contract for the sale of the Beartooth stock, and that Bretz relied on that contract in selling the coal from the Beartooth mine. Summary judgment, he argues, was inappropriate, because PGE "made no effort to make any showing that Bretz did not rely on the contract and that it operated in *good faith* in all of the dealings." Appellant's Brief at 19 (emphasis original).

The doctrine of estoppel must be applied with great caution where a contract would otherwise be governed by the statute of frauds, as it allows oral statements to substitute for the written evidence the statute requires. *Fiers v. Jacobson*, 123 Mont. 242, 211 P.2d 968, 973 (1949). Under Montana law, in order for estoppel to block operation of the statute of frauds, a contract must exist, either orally or in writing. *Mueller v. Svejkovsky*, 153 Mont. 416, 458

---

**5.** The dissent argues that Bretz could reasonably have read "receptive to an offer" to mean that PGE would accept Bretz's indication of agreement. We fail to understand how this helps Bretz. Reading the August 23 letter as the dissent suggests makes it even clearer that the letter was not an offer. By indicating that PGE retains the final power of acceptance, the letter establishes that it was not within Bretz's power to close the deal unilaterally.

**6.** If any doubt remains as to whether PGE's August 23 letter was meant to constitute a binding offer, it is dispelled by PGE's prompt response to Bretz after PGE received Bretz's letter purporting to accept PGE's offer. On September 7, 1983, Tom Owens of Beartooth telegraphed Bretz: "It is urgent that you contact me re *your offer* for Beartooth Coal Co." ER 171 (emphasis added). PGE thus clearly did not believe it had a contract with Bretz at that time and quickly communicated its position to Bretz.

P.2d 265, 267 (1969); *Anderson v. KFBB Broadcasting Corp.*, 143 Mont. 423, 391 P.2d 2, 6 (1964). In order to prevail here, Bretz must present evidence that he had a contract with PGE at the time he sold the coal to the third party. This he has failed to do.

We have already held that the writings in this case were insufficient to create a contract. The only other relevant evidence Bretz presents is a phone conversation between himself and a PGE representative on August 25. Bretz submits a copy of what he claims is a contemporaneous memorandum of the conversation:

> LRB [Bretz] now asks "Warren is this deal done now—so I know where I stand?"
>
> Hastings [PGE's representative] says "Yes"—"Send over something in writing—put it with your letter of August 10—*when we have it*—you have the mine on deal we have made"

ER 161 (emphasis added). According to Bretz's own memorandum, PGE conditioned formation of the contract on PGE's receipt of Bretz's letter.

Bretz did not mail the August 29 letter until the afternoon or evening of August 30. ER 166. He entered into the third party contract for the sale of coal on August 30, *the same day* that he mailed the letter to PGE. Even if we accept Bretz's contention that the writings together with the phone call could constitute a contract, the contract was not formed until PGE received the August 29 letter, several days after Bretz allegedly sold the coal. Thus, construing the evidence most favorably to Bretz, there was no contract between Bretz and PGE at the time he made his contract for the sale of the coal. Bretz therefore cannot invoke equitable estoppel to override PGE's statute of frauds defense. *Mueller*, 458 P.2d at 267; *Anderson*, 391 P.2d at 6. Bretz could not reasonably have relied on the existence of a contract between himself and PGE on August 30, when, by his own evidence, the contract would not be formed until sometime later when PGE received his letter.

Bretz did not reasonably rely on any representations from PGE; he simply jumped the gun and he has no one but himself to blame for losses he may have suffered as a consequence. His attempt to shift his losses to PGE was properly rejected by the district court.

AFFIRMED.

BOOCHEVER, Circuit Judge, dissenting:

Because I believe that extraneous evidence was admissible and that there are genuine issues of fact to be resolved whether the parties entered an enforceable contract, and concerning Bretz' estoppel claim, I respectfully dissent.

## I. STATUTE OF FRAUDS

There is no dispute that under Montana law a contract for the sale of securities, as here involved, comes under the statute of frauds, Mont.Code Ann. § 30-8-319 (1987). The question at issue is not whether evidence other than the contents of the writings is admissible to prove the terms of an agreement, *see* Mont.Code Ann. § 28-2-905 (1987), but whether the parties made a valid agreement. "When the validity of the agreement is the fact in dispute" extrinsic evidence is not barred by the parol evidence rule. Mont.Code Ann. § 28-2-905(1)(b) (1987).

The terms of the agreement were set forth in the correspondence. On August 23, 1983, PGE responded to Bretz' offer for the securities, stating:

> Consequently we would be receptive to an offer of $2,750,000 from you and your associates provided the matter could be closed in a timely manner as proposed in your letter of August 10, 1983.
>
> .     .     .     .     .,
>
> I would appreciate you resubmitting your offer on the above basis.

Bretz responded on August 29, 1983 with an "Acceptance of Offer" stating:

> Foregoing Offer is amended to state a purchase price of $2,750,000.00. The joint venture accepts your counter-offer which includes our terms as set forth in

letter, as above. We consider that a contract for sale exists.

At that point there was no dispute as to the terms of the agreement. The only issue is whether there was a valid agreement. All that is necessary to satisfy the Montana Statute of Frauds is that the writing signed by the defendant is "sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a ... stated price...." Mont. Code Ann. § 30–8–317(1) (1987). Extrinsic evidence is admissible under an exception to the parol evidence rule not only when the validity of the agreement is the fact in dispute, but also when the documents relied on to satisfy the Statute of Frauds are ambiguous. Mont.Code Ann. § 28–2–905(2) (1987); *Empire Steel Mfg. Co. v. Carlson,* 622 P.2d 1016, 1021 (Mont.1981).[1]

PGE stated it would be "receptive to an offer of $2,750,000." Receptive is defined as "1. Capable of or qualified for receiving. 2. Ready or willing to receive favorably: *receptive to their proposals." The American Heritage Dictionary of the English Language* 1088 (1970) (emphasis in original). Contrary to the majority's assertion that only one reasonable conclusion could be drawn from the August 23 letter, it could reasonably be read as an offer "to receive favorably", i.e. to accept, Bretz' indication of agreement to the terms of the August 23 letter. Under this interpretation, PGE had no discretion to refuse Bretz' acceptance, and thus Bretz had the power to close the deal unilaterally.

Another factor indicating that the August 23, 1983 letter was a counteroffer is that, in contrast to the PGE letter of Au-

gust 5, 1983, it did not indicate that the $2,750,000 price was subject to approval by PGE's board.[2]

An examination of the August 23 letter and the other correspondence leads to the conclusion that it could reasonably be read as a binding offer. Nevertheless, because the final sentence of the letter states, "I would appreciate you resubmitting your offer on the above basis," I believe the letter is ambiguous whether it constituted a counteroffer or an invitation to submit an offer. Accordingly, Bretz' evidence that both parties treated the August 23 letter as an offer was admissible and there is a genuine issue of fact to be resolved.

## II. ESTOPPEL

I also believe that there is a genuine issue of fact whether PGE is equitably estopped from raising the statute of frauds defense. Bretz produced evidence that PGE told him, by telephone, that its August 23 letter was an offer that would become a contract upon Bretz's acceptance. The memorandum of the August 25th telephone conference indicates that Bretz asked "is this deal done now so I know where I stand?" PGE replied "Yes". There is no evidence that PGE informed Bretz that PGE intended to retain the right to revoke its offer prior to receipt of Bretz' acceptance.[3] Thus, there is a genuine issue of fact whether the fourth element for estoppel under Montana law has been met. "[T]he conduct must be done ... at least with the expectation, that it will be acted upon by the other party, or under circumstances that it is both natural and probable that it will be so acted upon." *Smith v.*

---

**1.** The Montana parol evidence rule "does not exclude other evidence of the circumstances under which the agreement was made or to which it relates ... or other evidence to explain an extrinsic ambiguity or to establish illegality or fraud." Mont.Code Ann. § 28–2–905(2) (1987).

**2.** The majority asserts that the letter refers to another commitment PGE had for the sale of stock, from which PGE would have to free itself before it could sell the stock to Bretz. In fact the letter refers to a commitment from another buyer for the *purchase* of the stock, and reflects no commitment on the part of PGE. The majority also asserts that "[t]he letter plainly states

that PGE *remained* 'receptive to an offer' from Bretz" (emphasis added), erroneously indicating that PGE's statement did not reflect a change from its position during the earlier negotiations. The letter does not use the word "remain".

**3.** As the majority points out, the memorandum also indicates PGE said "Send over something in writing ... when we have it you have the mine on the deal we have made." Although this statement creates an ambiguity, it does not eliminate the factual issue whether PGE's conduct as a whole made Bretz' reliance reasonable.

*Krutar,* 153 Mont. 325, 457 P.2d 459, 463 (1969).

There is a factual issue whether PGE should reasonably have expected Bretz to rely on its oral representations that there would be a binding contract when Bretz indicated his acceptance. There is also a factual question whether it was both natural and probable that PGE's conduct would "be acted upon." In my view, one natural and probable result of entering into a contract for the sale of a coal mine is that the purchaser will negotiate with third parties for the sale of coal. PGE failed to show that there was no genuine issue of fact regarding Bretz' estoppel claim. Thus, I would reverse the summary judgment on that ground also.