**Gregory GLASS, Plaintiff–Appellant,**

v.

**KEMPER CORPORATION, et al., Defendants–Appellees.**

No. 97–1261.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1997.

Decided Jan. 12, 1998.

Rehearing Denied Feb. 4, 1998.

Alan J. Mandel (argued), Chicago, IL, for Plaintiff–Appellant.

Bennett L. Epstein, John F. Zabriskie (argued), Hopkins & Sutter, Chicago, IL, for Kemper Corporation.

Robert N. Hermes (argued), Butler, Rubin, Saltarelli & Boyd, Chicago, IL, for Prime Group, Incorporated.

Robert N. Hermes (argued), Butler, Rubin, Saltarelli & Boyd, Chicago, IL, for Prime International, Incorporated.

Bennett L. Epstein, John F. Zabriskie (argued), Hopkins & Sutter, Chicago, IL, for Steven Timbers and John Neal.

Before POSNER, Chief Judge, and MANION and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

This diversity suit charges breach of an employment contract and related violations of rights conferred by the common law of Illinois, and also violation of Illinois' Wage Payment and Collection Act, 820 ILCS 115. The district court dismissed the statutory claim, holding the wage payment act inapplicable to the facts alleged in the complaint, 920 F.Supp. 928 (N.D.Ill.1996), and granted summary judgment for the defendants on the remaining counts, holding that there was no contractual or other basis for the plaintiff's common law claims. 949 F.Supp. 1341 (N.D.Ill.1997).

 The dismissal of the statutory claim was clearly correct. The act "applies to all employers and employees in this State." 820 ILCS 115/1. The plaintiff is not, and at no time relevant to this suit was he, a resident of Illinois. Nor did he perform any work in Illinois; all the work that he did for the defendants was done in Spain. Although the employer defendants have their principal places of business in Illinois, and are therefore "employers ... in this State," we do not think the statute has an extraterritorial reach. Its evident purpose is to protect employees *in Illinois* from being stiffed by their employers; to this end it imposes heavy sanctions on employers who fail to pay wages that have accrued. 820 ILCS 115/14; *Mueller Co. v. Department of Labor*, 187 Ill. App.3d 519, 135 Ill.Dec. 135, 543 N.E.2d 518, 521 (1989). It is inconceivable that the framers of the statute meant to extend its protection to employees abroad, who would usually not even be U.S. citizens, let alone residents of Illinois. Even federal statutes presumptively lack extraterritorial reach. *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991).

 True, the Illinois statute authorizes the state's department of labor to make agreements with other states by which Illinois will enforce those states' wage payment acts against employers in Illinois of those states' residents in exchange for reciprocal enforcement by those states of Illinois' act against employers of Illinois residents in those states. 820 ILCS 115/7. But this provision does not help Glass. It suggests

that Illinois' law does not protect even its own residents when they are working in another state. This makes it highly unlikely that it would protect a resident of *another* state who is working in a *foreign* country—especially since a state's attempt to regulate a transaction wholly in foreign commerce would violate the "negative" commerce clause. "A state cannot regulate sales that take place wholly outside it." *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 613 (7th Cir.1997). See also *Healy v. Beer Institute,* 491 U.S. 324, 336, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989); *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 581–84, 106 S.Ct. 2080, 2085–87, 90 L.Ed.2d 552 (1986); *National Solid Wastes Management Ass'n v. Meyer,* 63 F.3d 652, 656–61 (7th Cir.1995); *K–S Pharmacies, Inc. v. American Home Products Corp.,* 962 F.2d 728, 730 (7th Cir.1992).

■ We move on to the contract claim. Although the evidence bearing on the question whether the plaintiff had a contract with the defendants is almost entirely documentary, he is correct to point out that when the existence of a contract depends on inference from a series of documents, the inference is to be drawn by the trier of fact. *Coplay Cement Co. v. Willis & Paul Group,* 983 F.2d 1435, 1438–39 (7th Cir.1993); *Western Industries, Inc. v. Newcor Canada Ltd.,* 739 F.2d 1198, 1205 (7th Cir.1984); *Meyers v. Selznick Co.,* 373 F.2d 218, 222–23 (2d Cir.1966) (Friendly, J.). Summary judgment on the contract count was proper therefore only if no reasonable judge or jury could infer from the evidence that there was a contract. So let us see.

Gregory Glass, the plaintiff, is a real estate developer who in 1992 was hired by one of the defendants, The Prime Group, Inc., to manage the development of a retail shopping mall in Barcelona. The land for the mall was owned by a Spanish company, Kepro, that was indirectly controlled by Prime. The mall project itself was financed by defendant Kemper Corporation, which was granted an option to buy a controlling interest in Kepro. The terms of Glass's employment were set forth in a letter agreement of October 1, 1992, signed by an official of Prime on behalf of both Prime and Kepro. The letter specified an annual salary of $360,000 and extensive fringe benefits. Although the letter recites that the proposal in it is subject to ratification by the boards of directors of Prime and Kepro, the proposal was never submitted to either board, yet the defendants concede that it was a binding contract; and they honored its terms.

In May of 1994 Kemper, which now had three seats on the six-member board of directors of Kepro, including the chairman's, assumed control of the mall project and placed a Kemper vice-president, Michael Oberst, in charge. Kemper was eager to retain Glass and the four other Americans who were employed on the project. It directed Oberst to work out new contracts with the five "expatriates" that would keep them with the project; the agreement of October 1, 1992, with Glass, and, we assume, the parallel agreements with the other four expatriates as well, were terminable by either party on thirty days' notice. Oberst wrote Glass, who responded in June with a set of proposed terms for a new contract for himself and the others. Oberst responded with his own set of terms, which included increasing Glass's annual salary to $400,000. Although the response contained the notation "Revised terms and conditions to be approved by Kemper/Kepro Board," Oberst told Glass that Kepro's chairman had given him full authority to make all decisions necessary to the management of the project. Formally, Glass remained employed by Prime, but it was understood that his "real" employer was Kemper and Kepro; none of the negotiations over his continued employment were with Prime.

After further oral and written exchanges, Oberst on September 14 sent Glass and the other expatriates a "summary of expatriate compensation and benefits." The cover memo states that a summary of the compensation and benefits "being 'offered' to you" is enclosed and that the terms in the summary have been "approved by Kemper and will formally be ratified at next week's Kepro Board Meeting. Your respective 'deals' will be incorporated into a formal employment

agreement that is now being drafted by a law firm in Chicago. It goes without saying that each of you will have the opportunity to review the respective drafts of the employment agreement as soon as I receive a 'working copy' worthy of your attention." The summary that was enclosed, it should be noted, was a summary not of an actual employment agreement but merely of the salary and other benefits that Oberst proposed to include in the agreements.

Glass wrote Oberst on September 16 expressing satisfaction with the "new compensation/benefit package" and adding, "I have worked for months without a formal contract and have had no problems. This outline will do just fine until such time as we can get the form in place for everyone."

Kepro's board did not discuss Oberst's proposal at the September 21 meeting. Glass was fired on October 20, for reasons that are in dispute and do not bear on the issues in the case.

Glass contends that Oberst's memo to him and the other expatriates of September 14 was an offer and that his response two days later was the acceptance, creating a binding contract for the pay and other benefits summarized in the enclosure with the memo of September 14, 1994, but not part of the original contract of October 1, 1992. Glass points to cases which hold that letters of intent and other informal understandings can be treated as legally enforceable contracts even if some of the details of the parties' agreement have been left to further negotiation—that is, even if the agreement is not final. E.g., *Magallanes Investment, Inc. v. Circuit Systems, Inc.*, 994 F.2d 1214, 1218 (7th Cir.1993); *Dawson v. General Motors Corp.*, 977 F.2d 369, 374 (7th Cir.1992); *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990 (1990). We have no quarrel with those cases. They reflect a realistic awareness that the parties to contractual negotiations often intend to be bound before all the details of their deal have been worked out, in order to encourage a prompt start on performance of the contract. E.g., *id.* at 997; *Borg–Warner Corp. v. Anchor Coupling Co.*, 16 Ill.2d 234, 156 N.E.2d 513, 517 (1958);

*Channel Home Centers v. Grossman*, 795 F.2d 291, 299–300 (3d Cir.1986). But they have no direct bearing on whether one of the parties to a proposed contract, namely Kepro, was bound by the actions of its agent, Oberst.

This question has, potentially at least, two parts. The first is whether Oberst was in fact authorized to approve the terms of a new contract with Glass without getting board approval; the second is whether, if not, Glass believed, with reason, that Oberst had such authority. The first question cannot be answered on the present record with enough confidence to preclude a trial of the issue. The same reference to required approval by Kepro's board had appeared in the first contract, that of October 1, 1992, yet the defendants concede that the contract, although never submitted to the board, was binding. True, it may not have become a binding contract until Kepro, by paying Glass in accordance with its terms, ratified its agent's action in making the contract with Glass. *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1197 (7th Cir.1992); *Goldstick v. ICM Realty*, 788 F.2d 456, 460 (7th Cir.1986); *Athanas v. City of Lake Forest*, 276 Ill.App.3d 48, 212 Ill.Dec. 686, 657 N.E.2d 1031, 1037–38 (1995). But an alternative inference is that the agent, a predecessor of Oberst, was authorized to make a contract with Glass without submitting it to the board, and, if so, his successor may have been authorized to negotiate a superseding contract.

If Oberst was not authorized to do this, we would proceed to the next question, which is whether Oberst had apparent authority to bind Kepro. This question also has two parts. The first is whether, despite the frequent reminders that board approval was required, a reasonable person in Glass's position might have thought Oberst authorized to sign a binding contract. This is at least arguable. The word that Oberst used most frequently, "ratification," could be thought weaker than "approval"—could be thought (although this is not its legal meaning) to signify a merely pro forma review for compliance with trivial formalities, an inference furthered by Oberst's references to "form" and "formally." He represented Kemper as hav-

ing approved the new offer; and Kemper by now virtually controlled Kepro. So when he told Glass and the other expatriates on September 14 that the terms had been "approved by Kemper and will formally be ratified at next week's Kepro Board Meeting" this could have been understood as a representation that Oberst was empowered to make, and was making, a binding offer.

The second half of the question of apparent authority, however, is whether the other party was taken in by the appearance. *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 883–84 (7th Cir.1992); *Chase v. Consolidated Foods Corp.,* 744 F.2d 566, 569 (7th Cir.1984); *Gilbert v. Sycamore Municipal Hospital,* 156 Ill.2d 511, 190 Ill.Dec. 758, 622 N.E.2d 788, 795 (1993). From June on Glass repeatedly expressed, in jottings on documents sent him by Oberst and elsewhere, anxiety about the approval of the deal by the board (or boards) of directors. Apparently he took seriously Oberst's reminders that their deal had to be approved by Kepro's board. But there is a more decisive reason for believing not only that Glass was not "taken in," but also that he cannot prevail even if Oberst was authorized to make a binding offer. The reason is that Glass did not treat the September 14 proposal as an offer of a contract, or his response two days later as acceptance. He must have believed that Kepro's approval was required and that until it was given he was free to hold out for better terms. Clearly, as we show next, he did not think that he had accepted the contract, cf. *Bretz v. Portland General Electric Co.,* 882 F.2d 411, 414–15 (9th Cir.1989), and without an acceptance there is no contract.

On October 10, the five expatriates sent Kepro's board a letter which states that "we have all been discussing our individual employment situations with management over the past five months, but as of yet, not one of us has been able to conclude these discussions. We are of a similar mind and believe that these discussions should be concluded as soon as possible. To that end and in a spirit of co-operation with the Board, we request that you share with us the current draft of form of Employment Agreement which we understand is being prepared by [a Chicago law firm]." The letter expresses concern about the provisions regarding incentive pay in Oberst's proposal, requests that Prime pick up the expenses of the lawyer whom the expatriates had hired to negotiate the employment agreements, and concludes by expressing "hope we can reach agreement on employment matters as soon as possible. We desire to conclude these discussions by months end."

There was no reply, but on October 14 Oberst sent Glass and the other expatriates a draft of an actual employment agreement, as distinct from the pay and benefits part of the agreement that he had summarized a month earlier. He asked for Glass's and the other expatriates' comments on the draft agreement and suggested "a target date of no later than October 31, 1994 to conclude these agreements." The record contains the copy of the draft agreement that Glass received with the cover memo and Glass's extensive jottings on the draft. The jottings disclose considerable dissatisfaction with a number of the provisions. Among other things, he wrote "No" and "ridiculous!" beside the provision forbidding him for a period of ten years after the termination of the contract to disclose "any material confidential information" concerning Prime, Kemper, or Kepro.

Glass conferred with two of the other expatriates, and the three of them drew up a list of questions and comments about the terms of the employment agreements, including questions that cast further doubt on whether Glass believed that Oberst had authority to bind Kepro: "Will they [the employment agreements] be approved by BoD [board of directors]"; "Why talk to M.O. [Michael Oberst]—no authority unless letter from BoD giving M.O. proxies." One of the comments is that the expatriates need a "minimum outline" of the incentive-payment programs mentioned in the draft agreements. A provision allowing termination without cause is described as "total crap." More than fifty reservations concerning the draft agreement are expressed.

█ So matters stood when less than a week after Oberst's final communication to the group Glass was fired. When he was fired there was no contract; so extensive

were the reservations expressed by the expatriates in response to the draft agreement sent them on October 14 that it would be hopelessly speculative to conclude that Glass and Kepro had agreed on the essential terms of a new contract (that is, one superseding the October 1, 1992, contract). *Bright v. QSP, Inc.,* 20 F.3d 1300, 1304–05 (4th Cir. 1994). The disagreements among the parties might eventually have been worked out— were indeed, so far as the two expatriates who were not fired on October 20 were concerned. But that is irrelevant to Glass's claim. When he was fired on October 20, he was still working under the old contract, and he has abandoned any claim that the defendants violated the terms of that contract.

▪ The issue of Oberst's authority thus washes out. Even if he had, or Glass reasonably thought he had, the authority to make an offer whose acceptance would bind Oberst's principals, and even if the draft agreement enclosed with his memo of October 14 was such an offer, it was not accepted, so there was no contract. Glass argues that on September 16 he accepted Oberst's offer of the fourteenth, but that claim is belied by Glass's subsequent conduct. *Bretz v. Portland General Electric Co., supra,* 882 F.2d at 414 and n. 6; see also *Pratt Central Park Limited Partnership v. Dames & Moore, Inc.,* 60 F.3d 350, 354–55 (7th Cir.1995). The expatriates' letter of October 10 shows that they did not believe themselves bound by any earlier exchanges concerning a new contract.

▪ We are given slight pause by the fact that the parties pitch their whole argument in the briefs on the issue of authority, which seems to us tangential. However, the issue of the meeting of the minds has not been waived. The October correspondence and the expatriates' memo of private comments on the draft agreement appear in the appendix to the defendants' brief and were extensively discussed at the oral argument of the appeal. It would be pointless to remand for consideration of an issue that can be resolved only one way.

▪ Glass's other common law claims do not require extended discussion. The closest to having any merit is the claim of promissory estoppel—that he sold his house at a loss in August 1994 in reliance on Oberst's promise that Kemper would pay the closing costs. The promise was contained in Oberst's June offer, an offer that came with the usual caveats about the requirement that it be approved by Kepro's board. The promise, moreover, was not free-standing; it was implicitly contingent upon the negotiation of a final contract containing it, so that until that contract was agreed upon it was unreasonable to rely upon the promise. *Demos v. National Bank of Greece,* 209 Ill.App.3d 655, 153 Ill.Dec. 856, 567 N.E.2d 1083, 1088 (1991); *Runnemede Owners, Inc. v. Crest Mortgage Corp.,* 861 F.2d 1053, 1058–59 (7th Cir.1988); *Teamsters Local 282 Pension Trust Fund v. Angelos,* 839 F.2d 366, 371–72 (7th Cir.1988). And in fact the promise was not repeated in the September 14 offer that Glass claims is the final, binding contract.

AFFIRMED.