# In the
# United States Court of Appeals
## For the Seventh Circuit
––––––––––

No. 06-3132

IN RE:

OCWEN LOAN SERVICING, LLC MORTGAGE
SERVICING LITIGATION.

APPEAL OF:

OCWEN LOAN SERVICING, LLC, and MOSS, CODILIS
STAWIARSKI, MORRIS, SCHNEIDER & PRIOR, LLP.

––––––––––

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 02714, MDL No. 1604—**Charles R. Norgle, Sr.**, *Judge.*

––––––––––

ARGUED MARCH 28, 2007—DECIDED JUNE 22, 2007

––––––––––

Before POSNER, ROVNER, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendants in this class action have been permitted to appeal under 28 U.S.C. § 1292(b) from the district judge's refusal to dismiss, as preempted by the Home Owners Loan Act ("HOLA"), 12 U.S.C. §§ 1461 *et seq.*, and implementing regulations promulgated by the Office of Thrift Supervision, 12 C.F.R. §§ 560.1 *et seq.*, the plaintiffs' claims under California, Connecticut, Illinois, New Mexico, and Pennsylvania law. Pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction),

the plaintiffs appended these state-law claims to their federal-law claims, upon which the district court's jurisdiction was premised; these are claims under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.*, the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.*, and the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*

The complaint is a hideous sprawling mess, 40 pages in length with 221 paragraphs of allegations. We have found it difficult and in many instances impossible to ascertain the nature of the charges. It would have been better had the defendants deferred their motion, and the district judge his ruling, until either the defendants served contention interrogatories designed to smoke out what exactly the plaintiffs are charging, or better, because quicker and cheaper, the judge told the plaintiffs to specify the acts of the defendants that they are complaining about so that he could decide how much of the complaint was preempted. Still, the defendants can hardly be blamed for wanting to strangle the monster in its crib.

Ocwen, the principal defendant and the only one we need discuss (the other defendant is a law firm charged with having assisted Ocwen in the misconduct of which the plaintiffs complain), was at the times relevant to this case a federal savings and loan association engaged in servicing home mortgages originated by other lenders. When a loan is secured by a mortgage, the borrower may be asked to sign various transfer agreements that allow the mortgagee to assign not only the mortgage itself but also or instead various rights that the mortgage grants the mortgagee, such as the rights to collect monthly payments from the mortgagor, collect late payments from him, foreclose in the event of default, or place the mortgagor's payments for taxes and insurance premiums in escrow. The

administration of these rights is called "servicing" the mortgage. If the firm doing the servicing, such as Ocwen in this case, exceeds its rights under the transfer agreements, the mortgagor's recourse is against that firm rather than against the original mortgagee or the current holder of the mortgage. See *OTS Regulatory Handbook: Thrift Activities* 571.1 (Jan. 1994), www.ots.treas.gov/docs/4/429128.pdf (visited June 5, 2007); "Mortgage Servicing Rights: Traded Like Baseball Cards?," www.mortgagenewsdaily.com/662005_Mortgage_Servicing.asp (visited June 5, 2007).

Enacted in 1933, HOLA is "a product of the Great Depression of the 1930's, [and] was intended 'to provide emergency relief with respect to home mortgage indebtedness' at a time when as many as half of all home loans in the country were in default." *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 159 (1982) (citations omitted). HOLA empowered what is now the Office of Thrift Supervision in the Treasury Department to authorize the creation of federal savings and loan associations, to regulate them, and by its regulations to preempt conflicting state law. *Id*. at 161-62. Ocwen has given up its federal thrift charter; but this does not affect its defense that when it committed the acts for which the plaintiffs are suing any state-law claims based on those acts were preempted.

One of OTS's regulations, the validity of which is not questioned, allows federal S&Ls to "extend credit as authorized under federal law . . . without regard to state laws purporting to regulate or otherwise affect their credit activities." 12 C.F.R. § 560.2(a). The regulation goes on to provide:

> (b) Illustrative examples [of what federal S&Ls can do without regard to state laws]. Except as provided in

§ 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

(1) Licensing, registration, filings, or reports by creditors;

(2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;

(3) Loan-to-value ratios;

(4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

(5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

(6) Escrow accounts, impound accounts, and similar accounts;

(7) Security property, including leaseholds;

(8) Access to and use of credit reports;

(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

(10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

(11) Disbursements and repayments;

(12) Usury and interest rate ceilings to the extent provided in 12 U.S.C. 1735f-7a and part 590 of this chapter and 12 U.S.C. 1463(g) and § 560.110 of this part; and

(13) Due-on-sale clauses to the extent provided in 12 U.S.C. 1701j-3 and part 591 of this chapter.

(c) State laws that are not preempted. State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

(1) Contract and commercial law;

(2) Real property law;

(3) Homestead laws specified in 12 U.S.C. 1462a(f);

(4) Tort law;

(5) Criminal law; and

(6) Any other law that OTS, upon review, finds:

(i) Furthers a vital state interest; and

(ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

Ocwen makes much of the fact that the Office of Thrift Supervision has said that in applying the regulation a court should first decide whether the state law in question is listed in subsection (b) and, if so, Ocwen argues, that is

the end of the case. "OTS Final Rule," 61 Fed. Reg. 50951, 50966 (Sept. 30, 1996). Well, of course. And the OTS's statement further explains that subsection (c), the list of laws that are not preempted, is designed merely "to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations." *Id*. The list in subsection (c) is long and the categories it covers—contract and commercial law, tort law, and so forth—are very broad. It would not do to let the broad standards characteristic of such fields morph into a scheme of state regulation of federal S&Ls. Hence the statement in subsection (c) that state laws escape preemption only "to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." See also *Bank of America v. City & County of San Francisco*, 309 F.3d 551, 557-61 (9th Cir. 2002); *Haehl v. Washington Mutual Bank, F.A.*, 277 F. Supp. 2d 933, 939-40, 942-43 (S.D. Ind. 2003); cf. *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 33-34 (1996).

The line between subsections (b) and (c) is both intuitive and reasonably clear. The Office of Thrift Supervision has exclusive authority to regulate the savings and loan industry in the sense of fixing fees (including penalties), setting licensing requirements, prescribing certain terms in mortgages, establishing requirements for disclosure of credit information to customers, and setting standards for processing and servicing mortgages. See 12 U.S.C. §§ 1462, 1463, 1464; 12 C.F.R. §§ 500.1, 500.10; "OTS Final Rule," *supra*, 61 Fed. Reg. at 50965. But though it has some prosecutorial and adjudicatory powers ancillary to its regulatory functions, 12 U.S.C. § 1464(d); 12 C.F.R. § 509.1;

*Simpson v. Office of Thrift Supervision*, 29 F.3d 1418, 1422 (9th Cir. 1994), the Office has no power to adjudicate disputes between the S&Ls and their customers. See OTS, "How to Resolve a Consumer Complaint" 1-2, www.ots.treas.gov/docs/4/480924.pdf (visited June 5, 2007). So it cannot provide a remedy to persons injured by wrongful acts of savings and loan associations, and furthermore HOLA creates no private right to sue to enforce the provisions of the statute or the OTS's regulations. *Burns Int'l Inc. v. Western Savings & Loan Ass'n*, 978 F.2d 533, 535-37 (9th Cir. 1992).

Against this background of limited remedial authority, we read subsection (c) to mean that OTS's assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies. Suppose an S&L signs a mortgage agreement with a homeowner that specifies an annual interest rate of 6 percent and a year later bills the homeowner at a rate of 10 percent and when the homeowner refuses to pay institutes foreclosure proceedings. It would be surprising for a federal regulation to forbid the homeowner's state to give the homeowner a defense based on the mortgagee's breach of contract. Or if the mortgagee (or a servicer like Ocwen) fraudulently represents to the mortgagor that it will forgive a default, and then forecloses, it would be surprising for a federal regulation to bar a suit for fraud. Some federal laws do create such bars, notably ERISA, see 29 U.S.C. §§ 1132(a), (e), but this is recognized as exceptional. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 232 (1995); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142-43 (1990). Enforcement of state law in either of the mortgage-servicing examples above would complement rather than substitute for the federal regulatory scheme.

This is well explained in "Preemption of State Laws Applicable to Credit Card Transactions" ¶ IIC (Opinion of OTS Chief Counsel, Dec. 24, 1996, 1996 WL 767462):

> State laws prohibiting deceptive acts and practices in the course of commerce are not included in the illustrative list of preempted laws in § 560.2(b) . . . . The [Indiana] DAP [deceptive acts and practices] statute prohibits specified acts and representations in all consumer transactions without regard to whether the transaction involves an extension of credit. Although not directly aimed at lenders, this law affects lending to the extent that it prohibits misleading statements and practices in loan transactions by a federal savings association. Accordingly, . . . a presumption arises that the DAP statute would be preempted in connection with loans made by the Association.
>
> The OTS has indicated, however, that it does not intend to preempt state laws that establish the basic norms that undergird commercial transactions . . . . The Indiana DAP falls within the category of traditional "contract and commercial" law under § 560.2(c)(1). While the DAP may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the statute—the regulation of the ethical practices of all businesses engaged in commerce in Indiana. There is no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift institutions in the United States, or any other federal objective identified in § 560.2(a). In fact, because federal thrifts are presumed to interact with their borrowers in a truthful manner, Indiana's general prohibition on deception should have no

measurable impact on their lending operations. Accordingly, we conclude that the Indiana DAP is not preempted by federal law.

See also *Courtney v. Halleran*, No. 05-1244, 2007 WL 1309530, at *9 (7th Cir. May 7, 2007); *Binetti v. Washington Mutual Bank*, 446 F. Supp. 2d 217, 220 (S.D.N.Y. 2006) ("the New York Consumer Fraud Statute is precisely the type of general commercial law designed to 'establish the basic norms that undergird commercial transactions' that OTS has indicated it does not intend to preempt"); cf. *Cliff v. Payco General American Credits, Inc.*, 363 F.3d 1113, 1124-25 (11th Cir. 2004); *Bank of America v. City & County of San Francisco*, *supra*, 309 F.3d at 559.

We must decide, insofar as it is possible to do so with only the complaint to go on, which claims fall on the regulatory side of the ledger and which, for want of a better term, fall on the common law side.

The first 19 pages of the 40-page complaint accuse Ocwen of a variety of skullduggery, but do not indicate which bad acts are being charged as a violation of federal law and which as a violation of state law. Beginning at the bottom of page 19, however, the complaint lists the actual claims and indicates, though murkily, which are federal and which are state law claims. The first apparent state law claim is the third on the list and is entitled "fraudulent concealment." That term usually refers to a doctrine for tolling statutes of limitations, but the complaint seems to be using it to mean simply fraud. This claim alleges that Ocwen "concealed material facts" from the plaintiffs and the other members of the class, including "material terms of the loans." That sounds like a conventional fraud charge (though an implausible one—how can the material terms of the loan be concealed, when they are set forth in the

loan documents?), but there are also references to "unau-thorized charges," and it is not indicated whether they are unauthorized by the loan agreements or forbidden by state law.

The breach of contract allegations are elaborated in the fifth claim (the fourth seeks restitution as a remedy for the third claim, the one we've just been discussing). Here we read that Ocwen assumed the obligations in the plain-tiffs' loan agreements when it took over the loans for servicing, that the "plaintiffs satisfied their obligations by making timely payments of principal and interest on their loans," but that nevertheless "by charging late fees on payments that were not late, Ocwen breached its contracts with Plaintiffs and the Class" and also did so by "increas-ing the monthly payment amount due without notice" and "demanding payment of attorneys' fees in connection with legal proceedings that have not commenced and/or have not yet been incurred" (meaning of course that the *fees* have not yet been incurred, though the literal antecedent is "legal proceedings").

Although these seem like conventional breach of contract allegations, Ocwen argues that they are preempted by subsection (b)(10) of the OTS regulation: "Processing, origination, *servicing*, sale or purchase of, or investment or participation in, mortgages" (emphasis added). At least so far as bears on this case, servicing refers to the exercise of rights that are conferred by a partial assignment of a mortgage by the mortgagee. Instead of assigning the entire mortgage to Ocwen, the mortgagee in this case assigned some of the rights created by the mortgage contract—the "servicing rights"—to Ocwen, which according to the complaint proceeded to violate its contractual obligations. It is no different than if the original mortgagee, or an

assignee of the entire mortgage, had violated the terms of the mortgage or defrauded the mortgagor. We would have a different case if state law purported to forbid servicing or prescribe the terms of the assignment—suppose a state tried to limit the rights that the assignment conferred on the servicing S&L. But nothing like that is suggested here. If an original mortgagee can be sued under state law for breach of contract, so may the partial assignee if he violates the terms of the part of the mortgage contract that has been assigned to him.

The sixth claim is that Ocwen violated a "duty of good faith and fair dealing." Most state laws impose a duty of good faith performance of contracts, meaning that a party to a contract cannot engage in opportunistic behavior. *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (Ill. 1958); *Hentze v. Unverfehrt*, 604 N.E.2d 536, 539-40 (Ill. App. 1992); *Lockwood Int'l, B.V. v. Volm Bag Co.*, 273 F.3d 741, 745 (7th Cir. 2001) (Wisconsin law); *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992) (Illinois law) ("contract law imposes a duty . . . to avoid taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous"). An example of such behavior, from the *Lockwood* case, is a liability insurance company's paying a person who has sued the insured to convert his claim to one not covered by the insurance policy.

The full name of the duty, both in the complaint and in the cases—"duty of good faith and *fair dealing*"—could be thought ominously open-ended. But the full name is merely what is called a "doublet," a form of redundancy in which lawyers delight, as in "cease and desist" and "free and clear." Bryan A. Garner, *The Redbook: A Manual on Legal*

*Style* § 11.2(f) (2d ed. 2006). "Fair dealing" adds nothing to "good faith." See, e.g., *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443-44 (7th Cir. 1992) (Illinois law); *Restatement (Second) of Contracts* § 205 (1979).

The seventh claim charges Ocwen with "conversion of funds." If Ocwen converted borrowers' funds that it was holding in escrow to its own use, it would be guilty of the tort of conversion, but for all we can tell the claim may be nothing more than a rewording of the fraud claims.

The eighth claim is purely remedial; it seeks injunctive relief. Of course it is not a claim, that is, a cause of action, and should not have been labeled as such; it is a further example of how poorly drafted the complaint is.

The ninth claim alleges violations of the California Business & Professions Code §§ 17200 *et seq.* Not all state statutes that might be invoked against a federal S&L are preempted, any more than all common law doctrines are; for remember that contract and commercial law are among the laws listed in subsection (c) of the regulation, and all states have adopted the Uniform Commercial Code. If the California Business & Professions Code is some modest supplement to the UCC, then presumably it is not preempted. But it may be more, since it forbids "unfair competition" defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *Id*. § 17200; see *Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983); *People v. Duz-Mor Diagnostic Laboratory, Inc.*, 68 Cal. App. 4th 654, 658 (1998). As interpreted by the complaint, this claim charges a gallimaufry—a macédoine—of unlawful acts, including failing to provide mortgagors with adequate monthly statements of their account balances, assessing "excessive" late fees, and

"force placing insurance on properties that already have insurance coverage." There is no indication that these practices involve either breach of contract or misrepresentation, and it is apparent that prohibiting them could interfere with federal regulation of disclosure, fees, and credit terms.

Other allegations in the ninth claim may not be preempted, such as "failing to apply customers payments," "making improper negative reports about customers," or "forc[ing] customers to pay amounts they do not actually owe under threat of losing their homes." But one would have to know more about the specific conduct being charged to make a judgment. For example, those customers who "do not actually owe" anything—is this by virtue of the terms of the loan, or by virtue of some state law that regulates credit terms? In the latter event, this part of the claim would be preempted.

The ninth claim also charges a violation of a provision of another California statute, which forbids imposing a late charge for an installment payment that is no more than ten days late. Cal. Civ. Code § 2954.4(a). It is clearly preempted.

The tenth claim is based on still another California statute, the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*. The plaintiffs interpret the statute to forbid deceptive practices, such as falsely representing sponsorship or approval of Ocwen's services. If this is like common law fraud, then it probably is not preempted. But is it? One cannot tell from the complaint whether, for example, the charge is limited to deliberate deception or whether as interpreted by the plaintiffs the Act creates a code of truthful marketing that would constitute the regulation of advertising, which is one of the preempted categories listed in subsection (b).

The eleventh claim continues with the Consumers Legal Remedies Act but adds that Ocwen has engaged in "unfair" debt collection, specifically by misrepresenting that it incurred fees or other charges for which it is entitled to reimbursement under its loan contracts. But the specifics are offered merely as examples of Ocwen's "unfair" practices in violation of the Act, rather than as the entirety of the allegations. Again we don't know whether the charge goes beyond common law fraud.

The twelfth claim is based on the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a *et seq.* Some of the specific charges may well be preempted, such as that Ocwen charged more for replacement hazard insurance than what the insurance cost. If this is meant to suggest that the Act can be used to impose a cost-plus pricing scheme on federal savings institutions, it is preempted, but maybe the loan contracts at issue forbade the mortgagee to charge more than the cost of the insurance. The other allegations in this claim are of abusive debt-collection practices similar to those forbidden by the federal Fair Debt Collection Practices Act, one of the plaintiffs' federal claims; it is unclear what the Connecticut Act adds that would not be preempted—probably nothing. The claim that the plaintiffs "received exorbitant and usurious" mortgages is preempted. A mysterious claim that Ocwen knowingly concealed in its advertising "material facts about the deceptive mortgages" may not be preempted, depending however on what a "deceptive mortgage" is (probably a misprint).

The thirteenth claim repeats the charge of fraud, but this time under New Mexico's Unfair Trade Practices Act, New Mexico Stat. Ann. §§ 57-12-1 *et seq.* It goes on to charge "a gross disparity between the value received by the

[class] members [in New Mexico] and the price paid," a charge that clearly is preempted.

The fourteenth claim is under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, and complains that Ocwen "demand[s] [from the mortgagors] payments of fees for an entire foreclosure case at its inception." If this demand is forbidden by the loan contract, then the charge is not preempted; otherwise, it probably is.

The fifteenth claim is under Pennsylvania's Uniform Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 *et seq.*, and contains a number of preempted claims, such as charging "unreasonable fees," failing to provide borrowers with itemizations, "coercing borrowers to remit payments through EZ Pay," and imposing "predatory loan charges," along with straight fraud claims that probably are not preempted and charges that cannot be classified because too little information is provided, such as "applying loan payments to wrongful fees and charges first."

The sixteenth claim is under another Pennsylvania statute, the Fair Credit Extension Uniformity Act, 73 Pa. Stat. §§ 2270.1 *et seq.* It is basically a claim of deceptive practices in collection, but the frequent references to "improper," "unfair," and "unconscionable" make classification impossible.

The seventeenth claim returns us to New Mexico law, but this time with charges of slander of title—that, presumably to obtain repayment, Ocwen filed a *lis pendens* (a notice of litigation affecting real property, recorded in the registry of deeds) without a valid basis. This would not be preempted.

The eighteenth claim is against a bank that is no longer a defendant, or at least not a party to the appeal.

The nineteenth claim alleges negligence, with no further explanation. The twentieth alleges fraud, and does not appear to be preempted, though this could depend on the nature of the fraud, which is unexplained. This and other claims of fraud may fail to comply with the requirement in Rule 9(b) of the Federal Rules of Civil Procedure that the complaint plead fraud with particularity, but the issue is not before us on this interlocutory appeal.

The twenty-first claim, which is similar to the seventeenth, charges Ocwen with having defamed some of the plaintiffs by falsely representing that they were delinquent in repaying their loans. A charge of defamation (which would require, however, that Ocwen have made the false representation to third parties, and not just to the borrowers) is a good example of claim that the regulation does not preempt.

The twenty-second claim charges fraud, but without specifying the misrepresentations (or misleading omissions) constituting the fraud—and thus almost certainly violates Rule 9(b). The twenty-third and last claim is federal.

This tedious recital shows that the case is largely unripe for a determination of preemption. Despite its length, the complaint is vague. Some of the charges are pretty clearly, even certainly, preempted, as we have tried to indicate. Others probably are not, though this may depend on particulars omitted from the complaint. Many of the charges are so vaguely worded that we cannot guess whether they are preempted or not.

The complaint was filed in April 2004 after the transfer of the various suits against Ocwen to the Northern District of Illinois. Rather than trying to rule on preemption on the basis of an uninformative complaint, the district judge should have required the plaintiffs to specify the acts of Ocwen that they contend violate state law. Three years have been wasted. On remand, the judge must focus on the acts alleged in the complaint, seeking clarification from the plaintiffs where necessary and deciding in accordance with this opinion which are preempted and which are not. He must avoid the further protraction of this unwieldy litigation.

He will also want to consider whether any portions of the complaint should be dismissed for failure either to comply with Rule 9(b) or to comply with the recent pleading standard announced by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1967-69 (2007). The Court held that a complaint that charges an agreement between firms not to compete, in violation of antitrust law, must contain "enough factual matter (taken as true) to suggest that an agreement was made . . . . An allegation of parallel conduct and a bare assertion of conspiracy will not suffice." The Court rejected the heretofore canonical formula of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Court was concerned that *Conley*'s formula might be invoked to condemn the defendant in an antitrust case to conducting expensive pretrial discovery, in order to demonstrate the groundlessness of the plaintiff's case. The present case is not an antitrust case, but the district court will want to determine whether

the complaint contains "enough factual matter (taken as true)" to provide the minimum notice of the plaintiffs' claim that the Court believes a defendant entitled to.

In the present posture of the litigation, however, the denial of the motion to dismiss the complaint must be

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*