# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-3871

BPI ENERGY HOLDINGS, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

IEC (MONTGOMERY), LLC, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:07-cv-00186-DRH-PMF—**David R. Herndon**, *Chief Judge*.

ARGUED SEPTEMBER 13, 2011—DECIDED DECEMBER 8, 2011

Before POSNER, SYKES, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs, affiliated corporations that we'll refer to jointly as BPI, are producers of "coal bed methane" gas, a form of natural gas present in coal seams. (Natural gas *is* methane. We'll call coal bed methane gas simply "the gas"; the trade calls it CBM.) The defendants comprise a large private coal-mining company named Drummond Company, Inc., see www.drummondco.com (visited Dec. 5, 2011) and a

number of limited liability companies created by and affiliated with it and unnecessary to discuss separately. For simplicity's sake we'll pretend that all the Drummond companies are one company and call it Drummond. BPI has sued Drummond for fraud, basing jurisdiction on diversity of citizenship. The district court granted summary judgment in favor of Drummond, precipitating this appeal. The substantive issues in the appeal are governed by Illinois law.

Groundwater traps the gas on the surface of the coal. Being flammable, the gas must for reasons of safety be extracted from coal before the coal is mined. Pumping out the water frees the gas, which can then be pumped to the surface and recompressed for shipping. Gas extraction firms need access to coal from which to extract the gas and the coal companies need to have the gas removed from their mines before mining. Coal-mining companies can therefore benefit from working with a gas extraction firm, like BPI, and vice versa. See Nelson Antosh, "Conoco Enters Alliance to Develop Coal-Bed Gas," *Houston Chronicle*, July 6, 1994, www.chron.com/CDA/archives/archive.mpl/1994_1212361/ conoco-enters-alliance-to-develop-coal-bed-gas.html (visited Dec. 5, 2011); *Amoco Production Co. v. Southern Ute Indian Tribe*, 526 U.S. 865, 870-71, 875-76 (1999); *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836, 839 (9th Cir. 2007); *Northern Plains Resource Council v. Fidelity Exploration & Development Co.*, 325 F.3d 1155, 1157-58 (9th Cir. 2003).

Alliances between coal companies and gas extraction companies are therefore common, and BPI decided to try

to form such an alliance. It began by acquiring options to buy coal-mining rights; its plan was to sell the options to a coal company in exchange for the right to extract gas from its partner's coal. It advertised for a partner in *Coal Age*. Drummond responded, and after brief negotiations the parties signed a memorandum of understanding in which they agreed that BPI would sell its coal options to Drummond and Drummond would lease to BPI the right to extract gas from many of its coal holdings, not limited to those Drummond would obtain by exercising the coal-mining options that BPI would be transferring to it.

The memorandum of understanding is brief and recites that it is merely "intended to form the basis for negotiation of a final agreement" and that "the parties acknowledge that [it] does not constitute a binding agreement upon the parties" with an immaterial exception regarding confidentiality.

The memorandum had a short term, and upon its expiration was succeeded by a letter of intent that lists some of BPI's coal interests and Drummond's gas extraction opportunities, states that BPI has no interest in mining coal and Drummond no interest in producing gas, avers that the two firms "are desirous of forming a strategic alliance whereby BPI can assist [Drummond] in expanding [its] coal interests and [Drummond] can assist BPI in expanding [BPI's gas] interests," and adds that BPI "can further assist [Drummond] by degassing the coal and coal mines prior to, during and following coal mining operations on [Drummond's] reserves." The

letter of intent further states that it "will serve as the basis for negotiations of final agreements that will specifically outline the relationship between the parties" and adds that BPI will exercise its options to acquire more coal-mining rights and sell those rights to Drummond at cost and that Drummond will use its influence in pending negotiations to obtain gas extraction rights for BPI and the latter will have a right of first refusal to any such rights secured by Drummond. But the terms on which Drummond will lease those rights to BPI are not indicated in the letter of intent or elsewhere. Again there is a disclaimer: "the parties acknowledge that this [letter of intent] does not constitute a binding agreement upon the parties" (with again an irrelevant exception). "A binding commitment with respect to the transactions contemplated in this [letter of intent] will result only from execution of definitive agreements. This [letter of intent] contains the entire understanding of the parties as of the date hereof, and supersedes all prior oral or written agreements or understandings." Finally, the "parties agree to complete due diligence as quickly as possible and to work on final agreements that will specifically define the [parties'] responsibilities and commitments."

The letter of intent was signed in September 2004. The following month BPI began transferring coal rights to Drummond as contemplated by the letter of intent. Drummond dragged its heels in reciprocating by leasing gas extraction rights to BPI, and when it did begin leasing them (after BPI threatened to exercise its remaining coal options itself rather than transfer them

to Drummond), it failed to include maps showing where it was mining coal—and without those maps BPI did not know where it could begin to extract gas without interfering with Drummond's mining. Drummond had second thoughts about some of the gas leases that the parties had executed, proposing substitute leases with terms less favorable to BPI.

The relationship between the parties went from bad to worse. In February 2007 Drummond announced that it was terminating the letter of intent "in all respects, and specifically as to the proposed strategic alliance."

Drummond has a different version of the facts, but we'll accept BPI's (of course without vouching for them) because even if its version is accurate it does not have a fraud case. We note, however, that virtually the only source cited in BPI's statement of facts is its complaint. Because a grant of summary judgment is based on a determination that dispositive facts alleged by the prevailing party are not or cannot reasonably be disputed, it can be challenged (other than by showing that the opponent's claim or defense is groundless as a matter of law even if all its factual allegations are conceded) only by showing that some or all of those alleged facts are disputed, and this requires evidence, and allegations are not evidence. *Tibbs v. City of Chicago*, 469 F.3d 661, 663 n. 2 (7th Cir. 2006); *Nisenbaum v. Milwaukee County*, 333 F.3d 804, 810 (7th Cir. 2003); *FDIC v. Deglau*, 207 F.3d 153, 172 (3d Cir. 2000); see Fed. R. Civ. P. 56(c), (e), and Committee Notes to 1963 and 2010 Amendments to Rule 56. But BPI's sin was a venial one, because the

essential facts on which it relied in the argument section of its brief are supported by citations to exhibits that contain admissible evidence.

The memorandum of understanding and the letter of intent, had they singly or jointly formed a legally enforceable contract, would in essence have obligated Drummond to swap its gas extraction leases for BPI's coal-mining options on mutually favorable terms. If indeed Drummond failed to do that, BPI could have sued for breach of contract. It could have charged that Drummond had failed to perform its side of the bargain in good faith (thus violating the duty of good-faith performance that is read into every contract, *In re Ocwen Loan Servicing, LLC Mortgage Servicing Litigation,* 491 F.3d 638, 645-46 (7th Cir. 2007) (Illinois law); *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 279-80 (7th Cir. 1992) (same); *Restatement (Second) of Contracts* § 205 (1981)), by dragging its heels, as by failing to furnish mining maps and seeking to revise a key term in leases of gas extraction rights to BPI after having executed them.

But both the memorandum of understanding and the letter of intent unambiguously disclaim the creation of enforceable rights. A document can be a contract without calling itself a contract; many letters of intent create contractual rights. *Quake Construction, Inc. v. American Airlines, Inc.* 565 N.E.2d 990, 993-94 (Ill. 1990); *Glass v. Kemper Corp.,* 133 F.3d 999, 1002 (7th Cir. 1998) (Illinois law); E. Allan Farnsworth, "Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotia-

tions," 87 *Colum. L. Rev.* 217, 253-63 (1987). But when a document says it isn't a contract, it isn't a contract. Each lease of gas extraction rights by Drummond to BPI was a contract, but BPI isn't charging violation of the leases. Its complaint is that Drummond had promised to make the terms of the leases favorable to BPI, just as BPI had promised to sell its coal-mining options to Drummond at cost, but that not only had Drummond failed to carry out its promise, the promise was fraudulent—Drummond had never intended to lease gas rights on terms favorable to BPI; it was merely stringing BPI along in the hope of obtaining coal options on the cheap.

Illinois recognizes "promissory fraud," though, unlike most other jurisdictions, see *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999), and references there, only if it is part of a scheme to defraud. See, e.g., *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 682 (Ill. 1989); *Association Benefit Services, Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007) (Illinois law). The concern is that otherwise it would be difficult for a judge or jury to distinguish between a fraudulent promise and a mere breach of promise, that is, breach of contract. As defined by the Illinois courts, a "scheme to defraud" requires a pattern of fraudulent statements, *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., supra*, 545 N.E.2d at 682-83; *Speakers of Sport, Inc. v. ProServ, Inc., supra*, 178 F.3d at 866 (Illinois law), or one particularly egregious fraudulent statement. *Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995) (Illinois law). BPI is claiming a scheme to defraud.

Drummond argues that the claim is barred by the Statute of Frauds. But the Statute of Frauds is a defense to a claim for breach of contract, not a defense to a tort, and fraud is a tort, and promissory fraud is a form of fraud and so a tort and so not subject to the Statute of Frauds. At least that is the majority rule. See *Consolidation Services, Inc. v. Keybank National Ass'n*, 185 F.3d 817, 823 (7th Cir. 1999) (Indiana law); *Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d 466, 470 (5th Cir. 2002) (Texas law); *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 801-02 (9th Cir. 1991) (California law); *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294-96 (2d Cir. 1986) (Friendly, J.) (New York law); *Restatement (Second) of Torts* § 530(1) and comment c (1977); see also *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 189 (3d Cir. 1992) (New Jersey law); contra, *MediaNews Group, Inc. v. McCarthey*, 494 F.3d 1254, 1265 (10th Cir. 2007) (Utah law); *Bruce v. Cole*, 854 So. 2d 47, 58-59 (Ala. 2003); *Telecom Int'l America, Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (New York law). (The Second Circuit in *Wall v. CSX Transportation, Inc.*, 471 F.3d 410, 416 (2d Cir. 2006), reconciled *Telecom* with Judge Friendly's decision in *Lehman v. Dow Jones & Co*, *supra*, by distinguishing between a promise in the contract itself and a promise "collateral" to the contract, such as a promise intended to induce the promisee to sign a contract.) The position of the Illinois courts is murky, but, as near as we can fathom it, they have adopted the majority rule with variant wording. *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 500 N.E.2d 1, 7 (Ill. 1986); see also *Crawley v. Hathaway*, 721 N.E.2d 1208, 1212 (Ill. App. 1999); *Geva v. Leo Burnett Co.*, 931 F.2d 1220, 1224 (7th Cir. 1991) (Illinois law).

In arguing that BPI's claim of promissory fraud is barred by the Statute of Frauds, Drummond failed to cite any of the applicable precedents, or indeed even to acknowledge that promissory fraud is a tort rather than a breach of contract. Such ostrich tactics are sufficient grounds for rejecting the argument summarily. *Hill v. Norfolk & Western Ry.*, 814 F.2d 1192, 1198-99 (7th Cir. 1987); see also *Gonzalez-Servin v. Ford Motor Co.*, No. 11-1665, 2011 WL 5924441 (7th Cir. Nov. 23, 2011); *Gross v. Town of Cicero*, 619 F.3d 697, 703 (7th Cir. 2010); *In re Hendrix*, 986 F.2d 195, 200-01 (7th Cir. 1993). But to do so would not establish the merits of BPI's claim that Drummond entered into the memorandum of understanding and the letter of intent merely to obtain coal rights on favorable terms from BPI, since Drummond's business is coal mining, and that it had no intention of reciprocating by leasing gas-extraction rights to BPI on favorable terms, or perhaps on any terms not distinctly unfavorable to BPI. For the Statute of Frauds is not Drummond's only defense to the claim.

BPI's principal evidence in support of its claim is the memorandum of understanding and the letter of intent, and even if these were contracts for the exchange of the coal rights for the gas rights on mutually favorable terms, the fact that a party breaks a contract doesn't show that its promise to perform it had been fraudulent when made—that is, that the party had never intended to perform it. *Desnick v. American Broadcasting Companies, Inc.*, *supra*, 44 F.3d at 1354-55; *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999). Otherwise every victim of a breach of contract could sue for fraud, trading a

slightly higher burden of pleading and proof (pleading with particularity, Fed. R. Civ. P. 9(b), and proof by clear and convincing evidence rather than by a mere preponderance, *Avery v. State Farm Mutual Auto Ins. Co.*, 835 N.E.2d 801, 856 (Ill. 2005); *Integrated Genomics, Inc. v. Gerngross*, 636 F.3d 853, 863 (7th Cir. 2011) (Illinois law)), and a shorter statute of limitations—in Illinois five rather than ten years, 735 ILCS 5/13-205, -206; *Doe A. v. Diocese of Dallas*, 917 N.E.2d 475, 486-87 (Ill. 2009); *LeBlang Motors, Ltd. v. Subaru of America, Inc.,* 148 F.3d 680, 690-91 (7th Cir. 1998) (Illinois law)—for a shot at punitive as well as compensatory damages, *Slovinski v. Elliot*, 927 N.E.2d 1221, 1224-25 (Ill. 2010); *Back Doctors Ltd. v. Metropolitan Property & Casualty Ins. Co.*, 637 F.3d 827, 831 (7th Cir. 2011) (Illinois law); *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 389-90 (7th Cir. 2002) (same), while avoiding the Statute of Frauds and the parol evidence rule and any other defenses to suits for breach of contract but not for fraud.

BPI claims to have another piece of evidence of Drummond's perfidy. One of the gas leases that Drummond issued to BPI specified that BPI would pay a royalty of 6.25 percent. In his deposition, Garry N. Drummond, Drummond's CEO, said he wouldn't have approved such a low rate—that it was half the industry standard rate, and the employee who had specified the rate had simply made a mistake. But this is not evidence that the company was scheming from the outset to obtain favorable coal-mining leases from BPI and provide nothing in return. There is no evidence that 12.5 percent is not the standard royalty rate for a gas

extraction lease, or that the Drummond negotiators had said or done anything during the negotiation of the memorandum of understanding or the letter of intent to suggest that it would charge a lower than normal rate for leasing gas extraction rights to BPI in exchange for coal-mining rights. Drummond tried to rectify its mistake about the rate both by claiming that BPI had violated the terms of an executed gas-extraction lease because it had failed to arrange for required insurance, and by invoking arbitration in the hope of being authorized to renegotiate the lease. This contractual dispute between the parties has been settled; and neither a breach of contract nor an invocation of legal remedies in an effort to wiggle out of a disadvantageous commercial relationship is fraud.

In a final effort to bolster its charge of fraud, BPI argues that Drummond had engineered an identical scheme against another gas extraction company, Layne Christensen Company, the year before beginning to negotiate with BPI. Drummond had initially preferred to contract with Layne rather than BPI (which Drummond correctly surmised to be financially shaky) to pump gas from its coal. It signed a letter of intent and preliminary standstill agreement with Layne that required Layne to pay royalties and fees on gas extracted from Drummond coal. But it abandoned that venture before a definitive agreement was signed when it decided that an alliance with BPI could yield coal options (which Layne had not offered) in addition to gas royalties. Conceivably Layne incurred reliance costs based on the letter of intent—it issued a press release that implies that a

definite deal had been made: Layne Christensen Company, "Layne Christensen Announces Coalbed Methane Gas Project in the Illinois Basin with Triple A Minerals, L.L.P. [a Drummond subsidiary]," Aug. 12, 2003, http://investor. laynechristensen.com/releasedetail.cfm?ReleaseID=369439 (visited Dec. 5, 2011). But Layne's subsequent disappointment does not appear to have led to a lawsuit.

Even if there were proof of fraud, BPI's case would collapse for want of justifiable reliance. In the absence of fraud, promissory estoppel will make an otherwise unenforceable promise (unenforceable because not supported by consideration) enforceable if the promisee relied upon the promise to his detriment, provided the reliance was "reasonable." *Quake Construction, Inc. v. American Airlines, Inc.*, *supra*, 565 N.E.2d at 1005; *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 861 (7th Cir. 2001) (Illinois law); *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 504 (7th Cir. 1992) (same); *Restatement (Second) of Contracts*, *supra*, § 90(1); 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 2.19, p. 176 (3d ed. 2004). "Reasonable" in this context has the same meaning as due care, so unreasonable reliance would be equivalent to contributory negligence. But fraud is an intentional tort, and contributory negligence is not a defense to an intentional tort and therefore is not a defense to a claim to promissory estoppel that is based upon a fraudulent promise.

Reliance on a fraudulent representation need only be "justifiable," *Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008); *Restatement (Second) of Torts*, *supra*, § 537(b), by which is meant "not reckless," in other words not willfully em-

bracing a substantial risk. *Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 645 (7th Cir. 2002) (Illinois law); *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010). So the plaintiff may not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation," *Field v. Mans*, 516 U.S. 59, 71 (1995), because "if the plaintiff's own conduct is 'willful,' 'wanton,' or 'reckless,' it will be set up against similar conduct on the part of the defendant, and recognized as a bar to his action." W. Page Keeton et al., *Prosser & Keeton on Torts* § 65, p. 462 (5th ed. 1984).

So why don't courts *say* "reckless"? Law would be clearer if judges said what they meant. Well, sometimes they do: "The potential victim of a fraud may not ignore a manifest danger. That is recklessness." *AMPAT/ Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1042 (7th Cir. 1990).

Both the memorandum of understanding and the letter of intent were expressly nonbinding and envisaged the negotiation of final agreements defining the parties' mutual obligations. Without waiting for those agreements to be made, BPI went ahead and transferred extensive coal rights to Drummond in anticipation of reciprocal favors. By doing so it jumped the gun. There had been no agreement on the terms of the gas extraction leases that Drummond would be granting to BPI. It is reckless to rely on an agreement expressly stated to be nonbinding. Such a statement is equivalent to saying "you rely at your peril." You know there is a risk and

decide to gamble. If you lose the gamble, you have only yourself to blame.

To look at the question from another angle, how can a firm that wants to retain its freedom to change course avoid a suit for fraud if a warning not to rely, or (as in this case) equivalent language, in a preliminary agreement can be ignored? Cf. *Extra Equipamentos e Exportação v. Case Corp.*, 541 F.3d 719, 724-25 (7th Cir. 2008).

The flaws in BPI's case go beyond absence of evidence of fraud and absence of justifiable reliance. Drummond presented compelling evidence (not discussed by the district judge) that BPI's efforts at gas extraction were a failure—and indeed BPI went broke within two years after the parties' relationship dissolved.

AFFIRMED.