In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-2008

ERNEST J. OJEDA and BEVERLY V. OJEDA,

*Defendants-Appellants,*

*v.*

GAIL GOLDBERG,

*Plaintiff-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cv-02808—**Joan B. Gottschall**, *Judge.*

ARGUED NOVEMBER 30, 2009—DECIDED MARCH 25, 2010

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Ronald and Gail Goldberg were creditors of Ernest and Beverly Ojeda. The Goldbergs executed a short-term, high-interest-rate loan with the Ojedas in August 1998. Despite being unable to pay the $600,000 principal when the loan became due, the Ojedas continued to make monthly interest payments to the Goldbergs, facilitated by numerous extensions of the loan's maturity date. But these interest payments stopped abruptly in January 2006 and the Ojedas defaulted.

The Ojedas filed for bankruptcy in February 2006. As part of the bankruptcy proceedings, Gail filed an adversary proceeding against the Ojedas, seeking to have the $600,000 loan declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). In support of her position, Gail alleged that the Ojedas engaged in fraudulent conduct in conjunction with the extensions of the loan's maturity date. The bankruptcy court entered an order finding that the debt was dischargeable, and that even if it was non-dischargeable, the amount excepted from discharge was only the amount of unpaid interest and attorney's fees. On appeal, the district court determined that the bankruptcy court erred in holding the debt dischargeable and in calculating the amount excepted from discharge. We affirm the district court's decision in both respects.

## I. BACKGROUND

The Goldbergs were in the business of making short-term, high-risk loans. A mutual friend introduced the Ojedas to the Goldbergs because the Ojedas were seeking a $600,000 loan. As a part of the loan application process, the Ojedas provided the Goldbergs with collateral in the form of 160,000 Pan American Bank stock shares, valued at $800,000.[1] The Goldbergs took possession of the stock

---

[1] Ernest was the chairman of the board of both Pan American Bank and Bancshares. The security interest pledged was actually in shares of Bancshares stock, not Pan American; however,

(continued...)

certificate, which was registered in Ernest's name, but did not file a financing statement with the Illinois Secretary of State or a notice of stock power or hypothecation agreement with the bank.

The Ojedas also informed the Goldbergs that they were the sole owners of two entities, Dices Enterprises and Pelham Enterprises, Inc. The Ojedas owned and operated a McDonald's restaurant in Chicago through Dices Enterprises, while Pelham Enterprises was the owner of a second McDonald's restaurant in Chicago. These McDonald's restaurants were not used as security for the loan, but rather were disclosed to the Goldbergs so that the latter could have a full picture of the Ojedas' finances.

The Goldbergs executed a loan agreement with the Ojedas in August 1998, providing the Ojedas with a $600,000 loan, secured at an annual interest rate of 18%. Initially, the loan was supposed to be a short-term "bridge" loan, with the maturity date set at October 6, 1998. At some point, the maturity date was extended orally to January 6, 2000. After the Ojedas failed to meet the January maturity date, they delivered to the Goldbergs a new "collateral note" extending the loan's

---

[1] (...continued)

because Ernest viewed Pan American Bank and its holding company, Bancshares, as virtually the same entity, and because Gail does not raise any issues about the failure to distinguish between the two, we will use them interchangeably in this opinion when referring to the stock that secured the loan.

maturity date yet again, this time until December 1, 2000. This note continued the pledge and grant of the security interest in the 160,000 shares to the Goldbergs. In the interim, due to Pan American's financial difficulties, on October 5, 1999, its holding company, Bancshares, entered into a purchase agreement with JD Financial in which JD Financial purchased all of Bancshares' interest in Pan American Bank. JD Financial thus became the new holding company for Pan American. Ernest subsequently informed Bancshares shareholders (but not the Goldbergs)[2] that incident to the sale, Bancshares had executed a one-for-one-hundred reverse stock split of Bancshares common stock, resulting in a reduction of the Bancshares common stock to 15,000 shares.

Following the stock split, the Ojedas yet again failed to pay the remainder of their loan on the December 1, 2000 maturation date. The Ojedas continued, however, to make monthly interest payments to the Goldbergs for approximately eighteen months while Ronald and Ernest negotiated an extension of the now-expired note.[3] On November 1, 2001, Gail and the Ojedas executed another

---

[2] Ronald was at least aware of Pan American's financial difficulties because around the time of the bank's sale, Ronald wrote to Ernest expressing concern over the bank's financial condition and requesting additional guarantees of security. In response, Ernest agreed to have his two enterprises provide corporate guarantees as additional security for the loan.

[3] The delay in negotiating an extension presumably was due to Ronald's concerns over the value of the Pan American stock and the parties' efforts to find a mutually agreeable remedy to Ronald's concerns.

written extension in the form of a new secured promissory note for the principal amount of $600,000. Pursuant to this agreement, both Pelham and Dices guaranteed the note, Gail became the sole creditor of the loan, and maturity was set for January 3, 2003. This loan was secured by the now non-existent 160,000 shares of Bancshares stock, a fact unknown to the Goldbergs. Under this agreement, neither the Ojedas nor the corporations were restricted from selling or otherwise disposing of their assets, with the exception of the Bancshares stock.

In what has now become a common recitation, the Ojedas again failed to pay the principal when the newest loan matured in January 2003. They did, however, continue to make monthly interest payments, which Gail continued to accept. Meanwhile, in 2004, the Ojedas began looking for a buyer for their McDonald's restaurants. Because the Ojedas would face significant capital gains tax from any sale of the restaurants, they began to look for a "like-kind" business in which to invest the proceeds from any sale. In early October 2004, the Ojedas sold Pelham's and Dices's interest in the McDonald's restaurants and used approximately $1.1 million dollars from proceeds of the sale to pay the restaurants' outstanding claims and some of the Ojedas' creditors. The balance of the proceeds, approximately $2,300,000, was deposited into a "Starker trust" pending the investment of those funds into a like-kind asset. Shortly thereafter, in late December 2004, the Ojedas negotiated to buy a Joey Buona's Pizzeria Grille with the remaining proceeds from the McDonald's sales; they purchased the Joey Buona's franchise through Pelham.

The Ojedas made all of the required interest payments to the Goldbergs until January 2006, when they defaulted. The approximate value of the total interest paid up to that point was $801,000. The Ojedas never repaid any portion of the principal. Subsequent to the default, the Joey Buona's franchise failed in February 2006, prompting the Ojedas' voluntary Chapter 7 bankruptcy petition in January 2007.

Before the bankruptcy court, Gail alleged that the $600,000 loan should be excepted from discharge because the Ojedas engaged in fraudulent conduct designed to procure extensions of their loan. Namely, Gail alleged that her forbearance on the loan was fraudulently induced because the Ojedas never informed the Goldbergs of the sale of the McDonald's restaurants, continued to make interest payments with checks bearing the McDonald's account logo, and failed to inform the Goldbergs of the stock split. The bankruptcy court found that Gail was not justified in relying on the Ojedas' representation of the stock value because of Ronald's familiarity with Pan American's financial troubles, and that Gail was not justified in relying on the Ojedas' continued ownership of the McDonald's restaurants because the restaurants did not secure the loan. The bankruptcy court also found that even if Gail was justified in relying on the Ojedas' fraudulent misrepresentations, the amount that was excepted from discharge included only attorney's fees and unpaid interest.

On appeal, the district court reversed, finding that Gail was justified in relying on the Ojedas' fraudulent

conduct that led Gail to believe they still owned the Mc-Donald's restaurants. The court further found that the entire debt—$600,000—should be excepted from discharge because Gail was fraudulently induced to forebear from collecting the entire amount of the loan. The Ojedas appealed.

## II. ANALYSIS

### A. Fraudulent Misrepresentations

When reviewing a question that had its origination in a bankruptcy court, as opposed to in a district court, our review focuses on the bankruptcy court's actions. *See In re marchFIRST, Inc.,* 573 F.3d 414, 416 (7th Cir. 2009). A bankruptcy court applies a preponderance of the evidence standard when making dischargeability determinations under § 523(a). *In re Hudgens*, 149 F. App'x 480, 484-85 (7th Cir. 2005). We subject the bankruptcy court's decision to the same standard of review as does a district court. *In re Midway Airlines, Inc.,* 383 F.3d 663, 668 (7th Cir. 2004). Thus, we apply a clear error standard to the bankruptcy court's factual findings, and review its resolutions of legal questions *de novo. MarchFIRST*, 573 F.3d at 416. Justifiable reliance is a mixed question of law and fact and is reviewed for clear error. *See In re Apte*, 96 F.3d 1319, 1324 (9th Cir. 1996) (reviewing for clear error a justifiable reliance determination made in a bankruptcy court proceeding); *cf. In re Rovell*, 194 F.3d 867, 870-71 (7th Cir. 1999) (finding that reasonable reliance is a mixed question of law and fact reviewed for clear error).

In order for a creditor to receive an exception from discharge under 11 U.S.C. § 523(a)(2)(A), a creditor must show that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied. *See In re Scarlata*, 979 F.2d 521, 525 (7th Cir. 1992); *In re Mayer*, 173 B.R. 373, 377 (N.D. Ill. 1994).[4] We take each element in turn.

Both the bankruptcy court and the district court found that the Ojedas made false representations with the intent to deceive in their actions involving the Bancshares stock and the McDonald's restaurants. We agree with the bankruptcy court's factual findings in this regard, so the first two elements merit little discussion.

More problematic is the third element, justifiable reliance. The bankruptcy court found that Gail's reliance was unjustified with regard to both the Bancshares stock and the McDonald's restaurants. Justifiable reliance is a less demanding standard than reasonable reliance; it

---

[4] Although these cases discuss reasonable reliance, the Supreme Court modified that test in *Field v. Mans*, 516 U.S. 59, 71 (1995), when it held that a creditor's reliance need only be justifiable, even if unreasonable, to pass muster under § 523(a). *In re Bero*, 110 F.3d 462, 465 (7th Cir. 1997). Therefore, although the case-law predating 1995 focuses on the existence of reasonable reliance, justifiable reliance is now the correct standard, and any references in this opinion to pre-1995 case law should be read as incorporating the new standard.

requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field*, 516 U.S. at 71 (internal quotation marks omitted). Under the justifiable reliance standard, a creditor has no duty to investigate unless the falsity of the representation would have been readily apparent. *Id.* at 70-71. But the justifiable reliance standard is not an objective one. Rather, it is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff. *Id.* at 71-72.

Looking to this particular plaintiff, the bankruptcy court concluded that Gail, acting alone, was not justified in relying on any actions taken by the Ojedas. In fact, Gail personally did not rely on the Ojedas at all because she had such limited interaction with them. The bankruptcy court therefore examined whether Gail could claim justifiable reliance on the basis of actions taken by her husband, Ronald, acting as her agent.

After an extensive discussion of Ronald's background in lending as a successful venture capitalist and in business as a wireless communications operator, the bankruptcy court concluded that although Ronald (and thus Gail) relied on the Ojedas' continued ownership of the stock shares, this reliance was unjustified. The court determined that while Ronald was aware of Pan American Bank's troubles and tried to remedy his concerns by accepting corporate guarantees from Dices and Pelham as the basis for a loan extension, he failed to

request updated financial information from the companies. The court concluded that given Ronald's business background, his awareness of Pan American's troubles should have alerted him to the need to make the cursory examination required of a creditor who asserts justifiable reliance. We find no clear error in this determination.

But where the bankruptcy court went wrong was that it incorrectly determined that Gail, acting through Ronald, was unjustified in relying on the Ojedas' asserted continued ownership of the McDonald's restaurants. Although the bankruptcy court found that the sale of the restaurants coupled with the continued use of the Dices checks containing the McDonald's information was designed fraudulently to create an impression of continued ownership, it ultimately concluded that because Gail had no security interest in the McDonald's restaurants, she could not justifiably rely on the Ojedas' continued ownership of them. But we agree with the district court that the bankruptcy court's conclusion reflected a standard more akin to reasonable reliance than to justifiable reliance. And in this case, the controlling standard is justifiable reliance, which is less demanding than the reasonable reliance standard.

Even if the Goldbergs acted unreasonably, they did not act unjustifiably. As the district court noted, in this inquiry Ronald's particular business savvy is only relevant to the extent that he was aware of evidence of a potential falsity. Unlike the situation with the Bancshares stock, there is no evidence that Ronald was alerted to the sale of the McDonald's restaurants. As the Supreme Court

held in *Field*, creditors have no duty to investigate if they are unaware of a potential falsity. *See* 516 U.S. at 70-71. Ronald's business background alone did not trigger a duty to perform a "cursory" investigation of the McDonald's restaurants, which he still justifiably believed were owned by the Ojedas. The Ojedas' continued use of the checks bearing the McDonald's information lends further credence to this determination. Unless he possessed outside information, there was no conceivable way that Ronald could have been alerted to the sale when the Ojedas continued to give the impression that the sale never occurred. But there is no evidence that Ronald did possess outside information, as he did in the case of the stock shares. And although Gail did not hold a security interest in the restaurants, Dices and Pelham were both guarantors of the note. The sale of the McDonald's restaurants materially affected their financial statuses, thereby implicating their abilities to perform their obligations as guarantors. If nothing else, Gail could certainly rely on Dices' and Pelham's ownership of the restaurants in assessing their abilities to satisfy their obligations. For all of these reasons, we find that Gail, acting through Ronald, was justified in relying on the Ojedas' asserted continued ownership of the McDonald's restaurants. The bankruptcy court clearly erred in reaching the opposite conclusion.

### B. *Amount Excepted*

Because we find that Gail was justified in relying on the Ojedas' misrepresentations with regard to the McDonald's

ownership, we must determine what amount is excepted from discharge. This is a legal question, and our review is *de novo*, *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996) ("We exercise plenary review over the bankruptcy and district courts' legal interpretations of the Bankruptcy Code, including the exceptions to discharge."), but we are mindful of the fact that "'exceptions to discharge are to be constructed strictly against a creditor and liberally in favor of the debtor,'" *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000) (*quoting Scarlata*, 979 F.2d at 524).

However, we must address a preliminary matter that is a question of first impression in this court: we have not yet had occasion to determine whether a fraudulently induced forbearance constitutes an extension or renewal of credit for purposes of § 523. We now hold that a fraudulently induced forbearance does constitute an extension or renewal. Black's Law Dictionary defines an "extension" as "[t]he continuation of the same contract for a specified period," or "[a] period of additional time to take an action, make a decision, accept an offer, or complete a task." *Black's Law Dictionary* 622 (8th ed. 2004). It defines a "renewal" as "[t]he re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract." *Id.* at 1322. We think it is abundantly clear that a fraudulently induced forbearance fits squarely within these definitions,[5] and note that other

---

[5] However, we make no determination regarding in which category, extension or renewal, a fraudulently induced for-

(continued...)

circuits have reached the same conclusion. *See In re Biondo*, 180 F.3d 126, 132-33 (4th Cir. 1999); *In re Campbell*, 159 F.3d 963, 966 (6th Cir. 1998); *Field v. Mans*, 157 F.3d 35, 43 (1st Cir. 1998); *In re Gerlach*, 897 F.2d 1048, 1050 (10th Cir. 1990).

Finding Gail's forbearance within the ambit of § 523, we must determine the extent to which this forbearance was induced by false pretenses, as that will determine the amount excepted from discharge. Section 523 provides:

> (a) A discharge under . . . this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

In determining whether a forbearance is fraudulently induced, the creditor must prove that " '[1] it had valuable collection remedies at the time of the misrepresentation, [2] it did not exercise those remedies based upon the misrepresentation, and [3] that the remedies lost value during the extension period.' " *In re Kucera*, 373 B.R. 878, 885 (Bankr. C.D. Ill. 2007) (*quoting In re Beetler*, 368 B.R. 720, 730-31 (Bankr. C.D. Ill. 2007)). The bankruptcy court made a factual finding that Gail failed to establish the

---

[5] (...continued)

bearance best fits. Instead, we recognize that a forbearance could be considered an extension, renewal, or both, depending on the circumstances of a given case.

third element—that her collection remedies lost value during the time of the forbearance. We review the bankruptcy court's finding of fact for clear error. *MarchFIRST*, 573 F.3d at 416.

We find that Gail's collection remedies lost value as a result of the forbearance.[6] In 2004, the Ojedas owned the McDonald's restaurants and Dices and Pelham. When they sold the McDonald's restaurants, they grossed more than $5 million in profits. These funds were available in 2004, but in 2006, the funds had been invested into the then-failing Joey Buona's. The second mortgage that the Ojedas took out on their home had also been invested into the Joey Buona's, so it was no longer available to Gail. Clearly, the Ojedas possessed valuable assets in 2004 that they no longer possessed in 2006. Additionally, the Ojedas were not involved in bankruptcy proceedings, meaning that Gail could have collected on the loan in 2004 and presumably would have received more than she will now as a creditor in bankruptcy. This evidence establishes that Gail had valuable collection remedies,

---

[6] We also address the Ojedas' contention at oral argument that Gail must enumerate specifically her damages. Such a requirement is absent entirely from the test. Instead, in determining the amount of damages, Gail need only prove that she had valuable collection remedies at the time of the fraud, she did not exercise those remedies because of the Ojedas' misrepresentation, and those remedies are no longer as valuable as they were when the fraudulent representation was made. *See supra*.

which had lost substantial value by 2006. Gail has proven a prima facie case for fraudulently induced forbearance.

Now that we have determined that Gail's forbearance was induced by false pretenses, we may finally reach the question of the amount excepted from discharge. The initial loan to the Ojedas was not procured by fraud. We must instead consider what amount of the extension was procured by fraud. Because the statute provides that an extension is non-dischargeable "to the extent" that it is obtained by a false representation, the question for us is what portion of the forbearance is directly attributable to the false representation. *See In re Christensen*, Bankr. No. 04-B-17486, 2005 WL 1941231, at *5 (Bankr. N.D. Ill. Aug. 12, 2005).

The bankruptcy court determined that because the original loan amount—$600,000—was obtained honestly, none of that amount could be subjected to discharge. Instead, only the unpaid interest and attorney's fees were non-dischargeable. The district court, however, held that because Gail was induced by false pretenses to forebear on the entire loan, the entire loan amount was non-dischargeable despite the fact that the initial loan was procured honestly. Our review of the amount subject to discharge when an extension of credit but not an original loan is procured by fraud is *de novo*. *Birkenstock*, 87 F.3d at 951.

We agree with the district court. Although the initial loan involved no fraud, Gail forbore from collecting the entire debt, and this forbearance was directly attributable to the Ojedas' fraudulent inducement. Had Gail chosen

to collect on the loan, she would have been entitled to the full amount. Because she instead chose to forbear on the entire loan, we find that same amount non-dischargeable.

### III. CONCLUSION

The bankruptcy court clearly erred by finding that Gail was unjustified in relying on the Ojedas' misrepresentations about the McDonald's restaurants and by finding that Gail did not establish a claim for fraudulently induced forbearance. Additionally, the bankruptcy court committed an error of law in finding that only the unpaid interest and attorney's fees were non-dischargeable. Accordingly, the judgment of the district court is AFFIRMED.