In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1196

IN RE: CHRISTOS DIMAS,

*Debtor.*

CHRISTOS DIMAS,

*Debtor-Appellant,*

*v.*

GEORGE STERGIADIS,

*Creditor-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-04129 — **Edmond E. Chang**, *Judge.*

ARGUED FEBRUARY 25, 2021 — DECIDED SEPTEMBER 20, 2021

Before EASTERBROOK, WOOD, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Christos Dimas appeals a judgment ordering him to pay his former business partner, George Stergiadis, for capital contributions Stergiadis made to their failed business, 1600 South, LLC. Stergiadis's recovery effort

began in 2008 when he sued Dimas and their other business partner, Dean Theo, in Illinois state court. But Dimas's bankruptcy filings—seven petitions in six years—stalled the suit. Stergiadis filed a proof of claim in the most recent bankruptcy for the capital contributions. Dimas objected to the claim, but the bankruptcy court approved it in the amount of $618,974 after an evidentiary hearing. The court reasoned that, under Illinois law, the partners had an implied-in-fact contract to equalize capital contributions to the LLC, and Dimas thus owed Stergiadis the awarded amount to achieve equality. The district court affirmed.

On appeal, Dimas argues that the bankruptcy court misinterpreted 1600 South's operating agreement. Specifically, he insists that the operating agreement's plain language precludes an implied-in-fact contract to equalize capital contributions. He also contends that the bankruptcy court erred when it relied on extrinsic evidence to find an implied-in-fact contract existed among 1600 South's partners. We disagree, and thus affirm.

I

In 2006, George Stergiadis, Christos Dimas, and Dean Theo decided to open a fruit market in Libertyville, Illinois. So the three formed 1600 South LLC, executed an operating agreement, purchased land on which to build the market, and began construction. But the 2008 recession created financial difficulties for 1600 South that stopped construction of the market and eventually led to the LLC's dissolution in 2009. Thus began a protracted fight over the financial obligations each member owed to the others.

One front in that fight, and the one presented here, concerns whether the partners impliedly agreed to equalize their capital contributions to 1600 South (what we refer to as the "equalization agreement"). Whether the parties agreed to equalize capital contributions depends, in large part, on the 1600 South operating agreement (the "Agreement").

The Agreement provided that Dimas, Stergiadis, and Theo were 1600 South's sole members, each holding a one-third membership interest in the LLC, and 1600 South's profits and losses were shared according to ownership interest (that is, equally). The Agreement also provided that each member agreed to make an initial capital contribution on the date of execution. To that end, the Agreement listed each member's name followed by a dollar sign and a blank line. However, in the executed Agreement, those lines were left blank. If 1600 South needed more capital, the Agreement allowed each member to loan "monies" to the LLC. The Agreement then noted that any member "shall not be entitled … to a return on any capital contribution" except as provided in the Agreement. And, if dissolved, the members "shall look solely to the assets" of 1600 South "for the return of his … Capital Contribution."

The legal battle began in 2008 in Illinois state court when Stergiadis sued Dimas for breach of contract, asking for damages in the amount Stergiadis thought Dimas owed him to equalize the capital contributions to 1600 South. Before the case was resolved, however, Dimas filed for bankruptcy, triggering the Bankruptcy Code's automatic stay and pausing the state court litigation. From 2010 to 2015, Dimas filed six such petitions, none of which resulted in discharge. In 2016, Dimas filed his seventh petition and received a discharge that year.

But the discharge was not the end of the story. The United States Trustee moved to reopen the bankruptcy to recover the value of an undisclosed property.[1] The bankruptcy court agreed, and Stergiadis filed a proof of claim in Dimas's reopened bankruptcy case seeking the same amount he was seeking in the state court litigation. Dimas objected to the claim, and the bankruptcy court held an evidentiary hearing.

The hearing shed some light on each partner's initial contributions to 1600 South. The LLC obtained a $3,690,000 loan from Broadway Bank to buy and develop the property for the fruit market. Dimas testified that, at the loan closing, he made an initial capital contribution of $400,000 to 1600 South, while Stergiadis contributed $390,000 and Theo contributed $189,200. In addition, Dimas pledged as collateral for the loan his 3420 West Devon restaurant property. The Devon property's value is disputed. Dimas asserts that it was worth $1.2 million based on a $2,000,000 valuation in a loan summary and an existing mortgage on the property of $800,000. The bankruptcy court also heard evidence on the partners' other contributions to 1600 South. Stergiadis furnished $1,058,000 in cash and pledged an unencumbered 59th Street property to obtain a $425,000 line of credit. The line of credit was exhausted and all $425,000 was put into 1600 South. Dimas, for his part, paid $135,000 as part of an effort to secure financing for a construction loan. Dimas testified that he paid Theo $250,000 for construction costs for the LLC, but 1600 South's accountant did not record the payment. Dimas also paid $32,000 in attorneys' fees for work related to 1600 South.

---

[1] During his bankruptcy proceedings, Dimas failed to disclose that he was the sole owner of a restaurant at 3420 Devon.

Mark Argianis, 1600 South's accountant, testified about the members' capital contributions. Argianis referenced a 2008 general ledger he prepared that listed each member's capital account. The ledger reflected that Dimas contributed $200,217, Theo contributed $1,094,686.97, and Stergiadis contributed $1,058,487. Argianis then testified that Stergiadis's balance should be increased to reflect the $425,000 drawn on the line of credit Stergiadis secured on the 59th Street property and that Theo's capital account should be reduced by $320,000 to reflect a $150,000 salary that Theo received for two years without approval and a $20,000 contribution that Theo never substantiated. In sum, then, Argianis testified that Stergiadis's contributions totaled $1,483,487, Theo's totaled $774,868, and Dimas's totaled $200,717. Stergiadis's wife, Katerina, also testified. She recorded Stergiadis's contributions to 1600 South and reviewed the bank statements, deposits, and checks from Broadway Bank. Before Argianis prepared his ledger, she met with Argianis to discuss the documents in her possession that related to 1600 South. Adding all contributions together and dividing that sum by three, the "equalized" contribution amount for each member was $819,691.

The bankruptcy court found that Argianis and Katerina testified "very credibly," but found that Dimas had "no credibility," noting that he "may have concealed" sale proceeds he received related to the undisclosed property in his bankruptcy case, pointing to his failure to list his ownership interest in that property in his bankruptcy schedules.[2]

---

[2] During his bankruptcy proceedings, Dimas remained the sole shareholder of a restaurant at 3420 Devon, which he did not disclose in his bankruptcy case. The property on which the restaurant sat served as collateral for the $3,690,000 Broadway Bank loan. In 2014, as a result of 1600

Following the hearing, the bankruptcy court rejected Dimas's objection and allowed Stergiadis's claim, awarding $618,974. The court held that the members had an implied equalization agreement concerning all capital contributions to 1600 South. The court noted that Illinois law recognizes implied contracts, and Dimas's choice to list a "$32,000 equalizing contribution claim as an asset against his former partners" in his 2010 bankruptcy was evidence of such a contract. The court also rejected Dimas's argument that the claim amount should be reduced because Dimas had pledged his ownership interest in the 3420 Devon property as collateral, finding that Dimas did not make direct cash contributions to the partnership.

Dimas appealed to the district court, and the district court affirmed. In doing so, the district court held that the bankruptcy court properly relied on extrinsic evidence to find an equalization agreement. The court first discussed the blank lines in the Agreement under the initial contributions provision. It noted that the initial contributions *provision* was ambiguous, but that this ambiguity did not render the *Agreement*, as a whole, ambiguous (such that reference to extrinsic evidence was justified). Nevertheless, the court reasoned that the

South's dissolution, MB Financial (which had acquired Broadway Bank) foreclosed on 3420 Devon, which was sold at auction for $810,000 to Jimmy Boussis. But even after the foreclosure sale, Dimas still owned and operated the restaurant business on the 3420 Devon property. About one month after Dimas received his discharge, Boussis sold the 3420 Devon property for about $2 million, and Dimas vacated the restaurant. $825,000 of the sale proceeds were transferred to Dimas. The facts surrounding this transfer are cloudy (to be generous).

Agreement was incomplete; accordingly, the bankruptcy court appropriately—under Illinois law—considered extrinsic evidence to hold that the members entered into the equalization agreement. In support, the district court pointed to the absence of an integration clause in the Agreement and noted that nothing in the Agreement "suggest[s] that the document constitutes the entire agreement among the parties." It also highlighted Dimas's admission that the members had entered into a side agreement to reimburse Dimas for legal fees he paid on behalf of 1600 South. And the court relied upon the Agreement's loan provision, which noted that members "will *later* agree on the terms of loans made" to 1600 South "for further capital contributions."

## II

Dimas challenges the bankruptcy court's interpretation of the Agreement and its factual finding that the members entered into an equalization agreement. "[W]e review the bankruptcy court's factual findings for clear error and the legal conclusions of both the bankruptcy court and the district court *de novo*." *In re Chlad*, 922 F.3d 856, 861 (7th Cir. 2019); see *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010) ("When reviewing a question that had its origination in a bankruptcy court, as opposed to in a district court, our review focuses on the bankruptcy court's actions."). A factual finding is clearly erroneous only where we are "left with the definite and firm conviction that a mistake has been committed." *In re Veluchamy*, 879 F.3d 808, 814 (7th Cir. 2018). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) (quotation omitted).

A

Dimas first argues that the Agreement's plain language prohibits 1600 South's members from entering into an equalization agreement because the terms unambiguously provide that a member's exclusive remedy for return of their capital contributions was 1600 South's assets. According to Dimas, the bankruptcy court thus erred when it considered extrinsic evidence to find an equalization agreement among the members. Alternatively, Dimas asserts that the Illinois Limited Liability Corporation Act's default rules govern, and those rules foreclose an implied equalization agreement.[3]

1

We review the bankruptcy court's interpretations of the Agreement de novo. *Sourus L.L.C. v. Bolson Materials Int'l Corp.*, 905 F.3d 1009, 1011 (7th Cir. 2018). The parties agree that Illinois law governs. Under Illinois law, courts must interpret a contract with the "primary objective" of giving "effect to the intention of the parties." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). When a party attempts to offer evidence extrinsic to a written agreement to explain the parties' intent, Illinois courts look to two rules—the four corners rule and the parol evidence rule—to decide whether to consider the evidence. *Eichengreen v. Rollins, Inc.*, 757 N.E.2d 952, 956 (Ill. App. 2001). Illinois courts apply the four corners rule "in

---

[3] Under *Stern v. Marshall*, 564 U.S. 462 (2011), bankruptcy judges lack the constitutional power to enter a final judgment on a state law claim. See also *Matter of Anderson*, 917 F.3d 566, 573 (7th Cir. 2019). *Stern* arguments, however, can be forfeited, see *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 679 (2015), and neither party raised *Stern* before the bankruptcy court, the district court, or this court. So we do not address it here.

cases where a contract is facially unambiguous *and contains an express integration clause.*" *Id.* at 956–57. Because the Agreement does not contain an express integration clause, we apply the parol evidence rule.

Under the parol evidence rule, a court must generally exclude "evidence of understandings, not reflected in a writing, reached before or at the time of [a written agreement's] execution which would vary or modify its terms." *J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 642 N.E.2d 1215, 1217 (Ill. 1994). But, to invoke the rule, the written agreement must be a "fully integrated writing," *Geoquest Prods., Ltd. v. Embassy Home Ent.*, 593 N.E.2d 727, 730 (Ill. App. 1992); that is, the written agreement is the "complete and unambiguous agreement of the parties." *Ireland v. Esposito*, 417 N.E.2d 738, 743 (Ill. App. 1981); see *Armstrong Paint & Varnish Works v. Cont'l Can Co.*, 133 N.E. 711, 713 (Ill. 1921); see *Eichengreen*, 757 N.E.2d at 957–58. To determine whether a written agreement is fully integrated, a court may only look to that agreement. *J & B Steel Contractors, Inc.*, 642 N.E.2d at 1218–19 (reaffirming *Armstrong Paint*). And whether an agreement is fully integrated is the "threshold question for the application" of the parol evidence rule. *Pecora v. Szabo*, 418 N.E.2d 431, 436 (Ill. App. 1981).

The plain language of the Agreement does not demonstrate that it was the complete expression of 1600 South's members' agreement. As discussed, the Agreement lacks an integration clause and the plain language of the Agreement does not convince us that it was the complete agreement of the members. Take, for example, the Agreement's loan provision. That provision states that loans to 1600 South would be made "on terms and conditions to be agreed upon by [1600

South] and the Members." The phrase "to be agreed upon" expresses an intention to reach an arrangement for which the Agreement does not explicitly provide. And take the initial contributions provision. By providing lines next to each member's name, the Agreement contemplated that each member would provide a stated and agreed-upon amount of initial capital contributions to 1600 South. But, of course, those lines were left blank.

The provisions Dimas identifies do not persuade us otherwise. Dimas points to a provision in the Agreement that limits members' recovery upon dissolution, and argues that because this provision is not ambiguous, the door is not open for extrinsic evidence.[4] While this provision is not ambiguous, it does not foreclose the possibility that members could also agree to equalize contributions. So alone, that provision cannot provide a basis to exclude extrinsic evidence on the separate topic of whether capital contributions must be equalized. In sum, the bankruptcy court did not err when it considered evidence extrinsic to the Agreement.

2

Dimas argues in the alternative that the Illinois LLC Act prohibits an implied equalization agreement, pointing to 805 ILL. COMP. STAT. 180/10-10(a) and (d). But those provisions concern the "debts, obligations, or liabilities *of the company*," not of the members. Although Dimas characterizes Stergiadis's claim as an attempt to recover contributions Stergiadis made to 1600 South in order to invoke these provisions,

---

[4] The provision in the Agreement reads, "Upon dissolution, the Members shall look solely to the assets of the Company for the return of his or her Capital Contribution."

Stergiadis's equalization claim seeks recovery from its members, not from 1600 South. So we reject Dimas's argument based on the Illinois LLC Act.

B

Dimas next argues that several of the bankruptcy court's factual findings were clearly erroneous. Specifically, he contends that the bankruptcy court had insufficient evidence to find that there was an equalization agreement; that, when determining each member's contributions to 1600 South, the court failed to credit Dimas with the value of the pledged property at 3420 Devon while giving credit to Stergiadis for the $425,000 drawn on the 59th Street property line of credit, and should not have considered Stergiadis's claim amounts that lacked documentation; that the court incorrectly found Dimas not credible; that the equalization agreement essentially, and improperly, reforms the Agreement; and that the bankruptcy court admitted inadmissible evidence at the evidentiary hearing. Dimas did not raise his reformation or admissibility of evidence arguments below and gives no reason why we should address them now. See *Henry v. Hulett*, 969 F.3d 769, 785–86 (7th Cir. 2020) (en banc). We address Dimas's remaining arguments in turn.[5]

1

Dimas's insufficient evidence argument proceeds in two parts. First, Dimas asserts that an implied contract must have the same elements as an express contract, and the bankruptcy court's fact findings do not support each element. Second,

---

[5] The district court and both parties address these arguments under the clear error standard. We do as well.

Dimas argues that Illinois courts generally disfavor finding an implied contract when an express contract exists.

On the first argument, Dimas contends, in essence, that the bankruptcy court's finding that Dimas attempted to extract equalized contributions for $32,000 in attorneys' fees he paid on behalf of 1600 South does not support the inference that the members entered into an equalization agreement. But the entire record below counsels otherwise. Dimas testified that he sought equal contributions from Stergiadis and Theo for the $32,000 payment, noting that it was based on an agreement to divide that contribution into equal shares among the members. There was testimony from Argianis, supported by 1600 South's K-1s, that the members divided equally the profits, losses, and capital, and the bankruptcy court found Argianis's testimony very credible. And, of course, Stergiadis testified that the members had an implied equalization agreement. So we reject Dimas's argument.

Dimas's second argument improperly relies on a general principal that Illinois policy disfavors implied covenants to suggest that Illinois law disfavors finding an implied equalization agreement. See *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441–42 (7th Cir. 1992) (collecting cases). Although this argument presents a question of law, Dimas presents it under a challenge to the bankruptcy court's factual findings. And he frames it under a clear error standard of review, so any argument for an alternative standard of review on this issue is forfeited. No matter the standard, we reject the argument. Dimas asks the court to generalize a narrow policy in Illinois law, disfavoring finding implied covenants within express contracts, and hold that it applies broadly to disfavor any implied agreements. Dimas offers no case to support that

much broader principle, and we decline to extend the principle so broadly here.

## 2

Dimas next contends that the bankruptcy court erred in finding him not credible. We are "especially deferential toward [the] trial court's assessment of witness credibility." *First Weber Grp. v. Horsfall*, 738 F.3d 767, 776 (7th Cir. 2013).

The only reason Dimas offers for disturbing the bankruptcy court's credibility assessment is that the court was misinformed about the circumstances of his prior bankruptcies. In support, he asks us to take judicial notice of the fact that his former attorney in those bankruptcies has been recommended for disbarment. But we need not resolve Dimas's request concerning his former representation. The bankruptcy court premised its credibility determination on Dimas's failure to disclose more than $800,000 in assets in the present bankruptcy, not his former attorney's conduct in the previous bankruptcy filings. We have no reason to disturb the bankruptcy court's finding that Dimas "had no credibility."

## 3

Finally, Dimas contends that, assuming the existence of an implied equalization agreement, the bankruptcy court erred in calculating the value of those contributions. Specifically, Dimas insists that he should receive credit for $1.2 million related to the 3420 Devon property's value because it was pledged in 2006 to secure the Broadway Bank loan for 1600 South and Stergiadis got credit for what Dimas claims is a similar contribution.

But the contributions are not similar. Neither party disputes that Dimas initially pledged his 3420 Devon property as

collateral for the Broadway Bank loan or that Stergiadis pledged his 59th Street property to obtain a $425,000 line of credit. But that's where the similarity ends. The entire line of credit on Stergiadis's property was drawn and all the funds went into 1600 South. This is why Argianis testified that Stergiadis should receive a $425,000 credit to his capital contribution account. Dimas, meanwhile, merely used the 3420 Devon property as collateral for the Broadway Bank loan. He did not contribute any capital drawn from the value of the property. Furthermore, while both properties were sold when 1600 South went under, Dimas does not dispute that all the proceeds from the 59th Street property went to the Broadway Bank loan, whereas the proceeds from the 3420 Devon property were used to cover that property's first mortgage. Unlike Stergiadis, who pledged a property that was unencumbered, there was no excess value in Dimas's property to contribute to the 1600 South loan after it sold in foreclosure at a sum covering only the first mortgage. So the bankruptcy court did not clearly err when it credited Stergiadis with a $425,000 capital contribution but did not credit Dimas for a $1.2 million contribution.

Dimas insists that because the 3420 Devon property changed hands again after the foreclosure sale for a higher value, he should get credit at this higher valuation as part of his capital contribution. But this proof is not relevant to the capital contribution calculations. First, this latter sale included both the restaurant and the real property at 3420 Devon. This difference could account for the higher price, and Dimas provides no evidence to the contrary, so it sheds no light on what the pledged property was worth separately. But even if it did, at no point did 1600 South draw any equity from this property, at any valuation. And nor did that higher

valuation get reflected at the time it would have mattered: at the foreclosure sale when proceeds would have gone to the loan for 1600 South. Any transaction after this sale would not be to the benefit of 1600 South (indeed, Dimas pocketed $825,000 and 1600 South got nothing), and so the valuation in a latter transaction is irrelevant. In sum, there is no evidence that any proceeds from that latter sale ever went toward satisfying 1600 South's loan with Broadway Bank. Dimas provides no argument to the contrary.

Dimas's second argument fares no better. Although the contributions Dimas identifies from Stergiadis to 1600 South are absent from the accountant Argianis's general ledger, Katerina testified that Stergiadis made each contribution and presented some documentary evidence of at least one of them. As discussed, the bankruptcy court found Katerina a credible witness, and credited her testimony. Dimas offers no compelling reason why that credibility determination was clearly erroneous. So we reject his argument concerning Stergiadis's capital contributions.

AFFIRMED